JOHN GOSHORN vs. BOARD OF SUPERVISORS OF OHIO COUNTY.

NICHOLAS CRAWLEY vs. SAME.

ANDREW WILSON vs. SAME.

WILLIAM S. BRYAN vs. SAME.

R. W. HAZLETT vs. SAME.

July Term, 1865.

1. The county court of Ohio county issued bonds to the amount of 300,000 dollars, payable to the Hempfield Railroad Company, due in twenty years, with interest payable semi-annually, after having been authorized to subscribe that sum to the capital stock of the company, by the voters of Ohio county, at an election held according to law. HELD :

That the court acted within the scope of the authority and the powers granted it in the 61st chapter of the Code of Virginia, 1860.

2. The Hempfield Railroad Company is a Virginia corporation within the meaning of 57th and 61st chapters of Code of Virginia, 1860.

The *Hempfield Railroad Company* was incorporated by the legislature of *Pennsylvania* in 1850, to construct a railroad through the territory of that State from a point on the *Pennsylvania Central Railroad* near *Greensburg* in *Westmoreland* county, to the western boundary of *Donegal* township, in *Washington* county.† Under this law, the company was organized as a *Pennsylvania* corporation.

*He declined to sit in consequence of being a tax-payer in Ohio county.

†The western boundary of Donegal township is, in fact, part of the boundary line between Pennsylvania and West Virginia, some 14 or 15 miles east of Wheeling.

On the 14th March, 1851, the General Assembly of *Virginia* passed "An act to incorporate the *Wellsburg & Bethany Railroad Company*, and for other purposes." Session Acts, 1850–1, page 71. The sixth section of this act is as follows:

"The *Hempfield Railroad Company*, incorporated by virtue of an act of the General Assembly of *Pennsylvania*, approved on the          day of          1850, shall be, and are hereby, authorized to extend and construct their railroad from a point on the western boundary of *Donegal* township, in *Washington* county, in the said State of *Pennsylvania*, through the territory of *Virginia*, to the city of *Wheeling;* and if the said company shall avail themselves of the privilege hereby granted, they shall, as to all their rights, property, franchises, powers, duties and obligations within this State, be subject to all the provisions of the Code of Virginia, so far as the same are applicable and not inconsistent with the intent of this section; and they shall commence their said extension within three years, and complete the same within six years from the passage of this act."

The 11th section provides that the act shall be in force from its passage. The other sections contain nothing material to this controversy. The Code of *Virginia* referred to in the 6th section above quoted, is the Code of 1849.

A vote having been taken on the 8th of May, 1851, in *Ohio* county, on the question of a subscription by the county for not exceeding 3000 shares of the capital stock of the *Hempfield Railroad Company*, (the shares being 50 dollars each,) and three-fifths of the votes then given being in favor of the subscription, the county court, at its June term, 1851, ordered " that a subscription be made on behalf of the county for capital stock of the *Hempfield Railroad Company* to the amount of 150,000 dollars, or 3,000 shares, payable in coupon bonds of the county, which shall be made payable to said company or its order, at twenty years from their date, with interest payable semi-annually." Certain persons named in the order were appointed commissioners to make the subscription, and to agree with the directors of the railroad company as to the terms on which the subscription

should be made, and the place at which the bonds and coupons were to be payable.

Under this order, a subscription to the amount of 150,000 dollars was made to the stock of the *Hempfield Railroad Company* in the name of *Ohio* county, and 150 bonds of 1,000 dollars each, numbered from 1 to 150, and dated May 15th, 1852, were delivered to the company in payment of the subscription.

Another vote having been taken on the 23rd of October, 1851, on the question of an additional subscription of 150,-000 dollars, with the like result, the county court at its June term, 1852, ordered such additional subscription to be made, payable as before, in twenty year coupon bonds. This order was substantially the same as the one made at the June term of 1851. Under it, the second subscription was made, and one hundred and fifty more bonds were delivered to the railroad company, each bond being for 1,000 dollars, and dated May 15th, 1853. These last bonds were numbered from 151 to 300.

All the bonds from No. 1 to 150, thus issued, were in the following form:

     " *Commonwealth of Virginia, Ohio County.*

No. 40.                            $1,000.

This is to certify, that the county of *Ohio*, in the commonwealth of *Virginia*, is indebted to the *Hempfield Railroad Company* in the sum of 1,000 dollars, which sum said county promises to pay twenty years after the date hereof, to the said railroad company, or the holder hereof, at the city of *New York;* together with interest thereon, at the rate of six per cent. per annum, payable semi-annually, on the 15th day of May and November, (until the principal sum shall be paid,) on the presentation of the annexed coupons or interest warrants, at the said city of *New York.* And the said county further agrees, that this obligation, and all rights and benefits arising therefrom may be transferred by general or special endorsement, or by delivery; for which payments well and truly to be made, the faith and property

of the said county of *Ohio*, together with the amount of its stock subscribed and held in the said *Hempfield Railroad Company*, are hereby pledged under the authority granted in the 61st chapter of the Code of Virginia. In witness whereof, the undersigned, commissioners and agents appointed by the court of the said county, have hereunto set their hands, and caused the corporate seal of the said county to be affixed, and attested by the clerk of the said court, this 15th day of May, A. D., 1852.

L. S.

> J. GOODING,
> W. T. SELBY,
> JAMES KELLY,
> JAMES BAKER,

*Agents and Commissioners of Ohio County.*

Teste, JOHN McCULLOCH, Clerk."

The bonds numbered 151 to 300 were, as before stated, dated the 15th day of May, A. D., 1853, instead of the 15th day of May, A. D., 1852; and were signed by *J. Gooding, W. T. Selby* and *James Baker*, as agents and commissioners of *Ohio* county; but in all other respects they were in the same form as the above.

Immediately beneath each of the said bonds, from No. 1 to No. 150, there was, upon the face of it, a guaranty of the *Hempfield Railroad Company*, in the following form:

"For value received, the *Hempfield Railroad Company* hereby guaranties the payment of the principal and interest of the above bond, No. 40, according to the terms thereof.

L. S.     In witness whereof, the seal of the said company is hereto affixed, and these presents are signed by the president, and countersigned by the treasurer, this 15th day of May, A. D., 1852.
THOMAS M. T. McKENNAN, President.

*Joseph Henderson*, Treasurer."

The guaranty subjoined to the bonds numbered 151 to 300 was the same as the above in all respects, except that it was dated the 15th day of May, A. D., 1853, and was signed *William Hart Carr*, treasurer, and *R. T. Conrad*, president.

Forty coupons or interest warrants, for the several semi-annual instalments of interest, were annexed to each bond. These were *mutatis mutandis*, in the following form:

"Ohio County Bonds.
Warrant for Thirty Dollars.
Interest on Bond No. 40, payable in the city of
New York, on the 15th of May, 1858.

$30.                    *John McCulloch*, Clerk of Court."

A large amount of the bonds had been arranged on terms satisfactory to the holders, and surrendered to and cancelled by the county.

There were five separate writs of *mandamus nisi*, issued respectively on the petitions of *John Goshorn, Nicholas Craw-ley, Andrew Wilson, William S. Bryan* and *Robert W. Hazlett,* against *John C. Hupp* and nine others, members of the Board of Supervisors of *Ohio* county. The petitioners proved to the court, in all, thirty-nine of the bonds above described, amounting to 39,000 dollars; with unpaid coupons annexed to the same, maturing at different dates from November 15th, 1857, to November 15th, 1864. The coupons amounted to 12,630 dollars, exclusive of interest. The demands of the petitioners were not for the principal of the thirty-nine bonds, but for the unpaid coupons, with interest on each from the time it matured. The coupons were held respectively, as follows: by *John Goshorn,* 196 coupons, amount 5,880 dollars; *Nicholas Crawley,* 122 coupons, 4,560 dollars; *Andrew Wilson,* 48 coupons, 1,440 dollars; *William S. Bryan,* 13 coupons, 390 dollars; and *R. W. Hazlett,* 12 coupons, 360 dollars.

The writs commanded the defendants, as members of the Board of Supervisors, to allow these claims and levy a tax on the property within the county to pay the same, or show cause before this court why they had not done so.

The cases involving the same matter of controversy were heard together. When the petition was first presented by the plaintiff at the January term, 1865, of this court, the issuing of a peremptory writ of mandamus was resisted by the defendants, who insisted that a rule for a *mandamus nisi*

should first be granted, which position was sustained by the court; and accordingly, a rule was issued requiring the defendants to show cause at the July term following, if any they could, why a peremptory writ of mandamus should not be awarded against them.    To this writ they made return: 1st. That the writ was not sufficient in law; 2nd, That the county of *Ohio* did not, nor did the defendants or the Board of Supervisors of *Ohio* county, owe the plaintiffs any part of the sum demanded in the writ; 3rd, That the *Hempfield Railroad Company* was not a joint stock company incorporated by or under any law of *Virginia*, at the time the pretended bonds and coupons were issued; 4th, That whilst it was true the county court of *Ohio* county had authority in law to subscribe, on behalf of the county, in the manner, and subject to the regulations, restrictions and limitations specified in the acts of the General Assembly of *Virginia*, for capital stock of any joint stock company incorporated by or under any law of *Virginia* to construct a railroad or turnpike through, by or near to the county, if it were likely to be benefitted thereby, and to cause a loan to be negotiated for in the name of the county, and to levy taxes as prescribed by the acts of the General Assembly of *Virginia* for the purpose of paying the quotas on the stock so subscribed, or the instalments of such subscriptions, as they might fall due, or to pay such loan and the interest thereon, yet no such loan was ever negotiated for in the name of the county of *Ohio* for the purpose of paying the pretended subscription mentioned in the writ, or any instalment thereof as it fell due, or any quota as it might be called for on said pretended subscription.    Therefore the county court of *Ohio* county had, without authority in law, made and delivered the bonds mentioned in the writ, together with all others delivered to the *Hempfield Railroad Company* on said pretended subscription.

The defendants in their return, also claimed that there were other irregularities in the execution of this power by the county court.    That the subscription was made before the *Hempfield Company* accepted or availed themselves of the

act of March 14th, 1851; that the day on which the question of subscribing stock to the company was submitted to the voters of *Ohio* county, was not a day of general election for members of the General Assembly, and that notice had not been given for at least one month previous to the same.

*Wheat* and *Jeffers* for the petitioners, insisted: 1st, That the *Hempfield Railroad Company* was a *Virginia* corporation; 2nd, That it was immaterial here whether it was so or not; 3rd, That the county court of *Ohio.* county had authority to subscribe to the capital stock of the *Hempfield Railroad Company;* 4th, That the county court and its commissioners had complied as strictly with the 41st section of chapter 61, of the Code, and the intention of the General Assembly of *Virginia*, as the nature of the transaction would demand or permit; and even if there was any departure from a rigid interpretation of the law, it was intended to operate to the benefit of the county, and it could not be allowed to plead or set up any wrong or negligence of its own to the prejudice of third parties; 5th, That the county court had authority of law to issue the bonds with their coupons attached; 6th, That they constituted a legal, valid and binding claim against the county of *Ohio*; 7th, That the bonds and coupons were negotiable; 8th, That they were absolute upon their face and bound the county for their payment, and that the purchasers could have no notice from their inspection, that there was any irregularity in their issue, and that they were not bound in law to look behind the bonds or enquire further as to their validity; the legal presumption being that the county court had complied with every requirement imposed or required of it by the act authorizing its subscription; 9th, That the debt against the county was created at the time the subscriptions were made by it to the stock of the company; 10th, That the return of *John C. Hupp* and others, supervisors of the county of *Ohio*, was insufficient and inconsistent, and therefore the demurrer of the relators thereto should be sustained and a peremptory writ of mandamus, directed to *Hupp* and others members of the Board

of Supervisors of *Ohio* county, and their successors in office, should be ordered by this court to issue, commanding them and each of them and their successors in office, in the name of the State, to make the proper provision for the payment of the relators' claims.

They cited the following authorities: Act of March 14th, 1851, Session Acts, page 71; 57th and 61st chapters of Code 1849; Acts of General Assembly, March 31st 1847–8; March 14th, 1848–9; March 8th, 1827; April 2nd, 1838; February 19th, 1845; February 28th, 1846; *Baltimore and Ohio Railroad* vs. *Gallahue's adm'r.*, 12 Grat., 659; Tappan on Mandamus; *Magetts* vs. *City of Green Bay*, 8 Amer. L. Rep., 271; *Com. ex rel.* vs. *Pittsburg*, Ibidem 286; *Graham & Knox* vs. *City of Maysville*, 6 Ib., 589; *Knox Co. Com.* vs. *Aspenwall*, 21 Howard, 539; *Seyburt* vs. *City of Pittsburg*, 1 Wallace, 272; *Gilpeck* vs. *City of Dubuque*, Ib., 176; *Mercer county* vs. *Hackett*, Ib., 83; *Moyer* vs. *Muscatine*, Ib., 390; 9 S. & R., 144; 4 Harris, 371; *White* vs. *Vermont & Massachusetts R. R. Co.*, 21 Howard, 575; Parsons on Contracts, 241; Pierce on Railroad Law, 129–371; Redfield on Railroad Law, 595; Edwards on Bills, 60; Smith's Leading Cases, 447–9–50; *State of Ohio* vs. *Clinton county*, 6 Ohio S. R., 280; *Louisville Railroad* vs. *Litson*, 2 Howard, 497; 1 Black, 296–7.

*Lamb* and *Paull* for defendants.

The law which confers the power on a corporation, which is the creature of a statue, to contract, must be strictly observed or the pretended contract is void, because the corporation had not capacity to make it: *Chillicothe Bank* vs. *Swayne*, 8 Ohio R., 257; *Head* vs. *The Providence Insurance Company*, 2 Cranch, 127; *Dartmouth College* vs. *Woodward*, 4 Wheat, 696; *Bank of Augusta* vs. *Earle*, 13 Peters, 587; *Beatty* vs. *Knowles' lessee*, 4 Peters, 168; *Perrine* vs. *The Chesapeake and Delaware Canal Company*, 9 Howard, 193; *Maddox* vs. *Graham*, 7 Amer. L. Rep., 760; S. C., Metc. Ky. Rep.; 2 Kent's Com., 299; Willcock on Municipal Corporations, page 26, section 12; Angell and Ames on Corporations, sections 253, 256; 4 Kent's Com., 330.

If the rule is applied in the cases of powers granted by individuals, or granted by the legislature to ordinary corporations, for the management and disposal of their own money or property, much more is it applicable in such cases as the present. The county court was the mere creature of the law. It had no power nor capacity but what the law gave it. Certainly, it had no power to take the property or money of individuals, by taxation or otherwise, and invest the same in railroad stocks, unless such power was clearly and beyond reasonable doubt conferred by the legislature. If the legislature granted the power, it might undoubtedly interpose what checks it pleased to guard against the tendency to abuse; and when a power is so liable to abuse, as must be the case where one set of men have the right to take and dispose of the property of others, it will not be disputed that the courts ought to be "severely exact" in insisting upon a strict compliance with all the checks and conditions which the legislature has seen fit to impose.

In making the subscriptions to the *Hempfield Railroad*, and issuing 300,000 dollars of twenty year bonds for the same, the members of the county court were assuming to dispose, not of their own property alone, but of the property of all the tax-payers of the county. The property of every person in the county was thereby, in effect, mortgaged to secure the payment of a most onerous debt. If the law allowed this, we must submit; but in such case, assuredly, the power ought to be clear and unquestionable, and every security against its abuse should be rigidly enforced.

But it will be said the question of subscription was submitted to a popular vote. True—but have minorities no rights? Have individuals no rights which even a majority cannot take away, without the strict sanction of the law? If a community consists of A, B, C, D and E, have A, B and C, because they are a majority, the right to take the property of D and E and invest it in railroad stocks? Minorities and individuals hold their property subject, not to the will of the majority, but to the rules of law.

Tax laws, it is said, are to be strictly construed. Where·

COURT OF APPEALS OF WEST VIRGINIA. 317

July Term,        Goshorn et al. vs. Supervisors Ohio Co.        1865.

the public are to be charged with a burden, the intention of the legislature to impose that burden, must be explicitly and distinctly shown. (Dwarris on Statutes, 749; Plumer's case, 3 Grat., 647.)

In a case, (*City of Richmond* vs. *Daniel*, 14 Grat. 387,) involving the right of the city council of *Richmond* to tax certain property, the court of appeals of *Virginia* held that such powers, being in derogation of common right, carved out of the general power of taxation vested in the legislature of the State, and derivative merely, ought to be strictly construed. "Especially," they say, "is the power of taxation, when granted to a subordinate body, to be strictly construed." They held that the council could exercise no such power unless clearly granted, and then only in strict conformity with the terms and conditions of the grant.

The only authority in law for the subscriptions made by the county court on behalf of the county of *Ohio* to the capital stock of the *Hempfield Railroad Company*, or for the twenty year bonds issued in payment of the stock, is to be found in the 61st chapter of the Code of 1849, sections 38 to 43, as modified by the amendatory act of March 31st, 1851.

By this law "when a joint stock company shall have been incorporated to construct a railroad or turnpike through, by or near to any county likely to be benefitted thereby," the county court of such county were authorized, under the regulations and restrictions expressed in the statute, to subscribe for stock in such joint stock company on behalf of the county.

Was the *Hempfield Railroad Company* at the time the subscriptions were made " a joint stock company incorporated," &c., within the meaning and intent of this law? If it was, the county court, under the restrictions prescribed by the Code, had authority to subscribe for stock. If it was not, no such authority existed.

It was certainly not a joint stock company incorporated under any act of the legislature of *Virginia*. It will be seen by reference to the 6th section of the act passed by the

*Virginia* legislature on the 14th March, 1851, that the *Hempfield Railroad Co.* was incorporated in 1850 by virtue of an act of the General Assembly of the State of *Pennsylvania.* Under that law, it became and was a *Pennsylvania* corporation. It is recognized by the act of March 14th, 1851, as already an existing corporation. The legislature of *Virginia* merely authorized it to do a certain thing within this State, namely, to extend its railroad from the western boundary of *Donegal* township to the city of *Wheeling.* But can it therefore be said, with any propriety of language or construction, that the *Hempfield Railroad Company* was incorporated by the legislature of *Virginia?* Joint stock companies incorporated by one State may do many acts in other States.

The fact that a corporation created by one State is acknowledged or recognized by another State as an existing corporation, or is permitted by the laws of the latter to do certain acts or transact certain business within its territory, will certainly not justify us in saying that it has been incorporated by the latter.

There is nothing in the act of March 14th, 1851, to indicate that the legislature of *Virginia* supposed they were making a corporation. They speak of the *Hempfield Railroad* as already incorporated by the State of *Pennsylvania.* As such they recognize and acknowledge it as an existing corporation, and confer upon it a right to do certain things in the territory of *Virginia.* To have proceeded to incorporate it, would have been inconsistent with the language and object of the act, for the act states that it was already incorporated. Unless therefore we assume the position, that whenever a foreign corporation is authorized by the laws of the State of *Virginia* to do any acts within the territory of the State, it is thereby incorporated by the State of *Virginia,* we cannot claim that the *Hempfield Railroad Company* was a joint stock company incorporated by the State of *Virginia.*

The *Baltimore and Ohio Railroad Company* was incorporated by an act of the legislature of *Maryland,* passed February 28th, 1827. This act provided that "as soon as ten thou-

sand shares of the said capital stock shall be subscribed, the subscribers of the said stock, their successors and assigns, shall be, and they are hereby declared to be incorporated into a company by the name of the *Baltimore and Ohio Railroad Company*, and by that name," &c., &c. The *Virginia* act of March 8th, 1827, (Session Acts 1826–7, page 85,) recites the *Maryland* law in full, and then proceeds to enact "that the same rights and privileges shall be and are hereby granted to the aforesaid company within the territory of *Virginia*, as are granted to them within the territory of *Maryland.*" "The company," says the court of appeals, "under this law, is a *Virginia* corporation." (*Baltimore and Ohio Railroad Company* vs. *Gallahue's adm'rs*, 12 Grat., 655, 657.) Every right and power incident to a corporation was here conferred by the *Virginia* law; and so far as concerns the particular question now under consideration, it presents a different case altogether from that of the *Hempfield Railroad Company.*

But suppose we are mistaken on all this; that the *Hempfield Railroad Company* is to be regarded, notwithstanding the reasons alleged to the contrary, as a joint stock company incorporated to construct a railroad through, by or near to the county of *Ohio*, within the intent and meaning of the 61st chapter of the Code; and that the county court had, therefore, authority to subscribe for its stock—the question still remains to be considered, whether, even upon this supposition, the bonds and coupons issued in the name of the county in payment of the subscription, are valid.

No loan was negotiated, as authorized by the Code, (See sec. 42, page 325, Code of 1849,) "for the purpose of paying the quotas on the stock as they may be called for, or the instalments of such subscriptions as they may fall due." No taxes were levied as contemplated by the Code, (See same section,) to pay the amount of the subscriptions, (300,000 dollars,) or of the loan or loans and the interest thereon; to be repeated from year to year until the subscriptions or loans were paid. The county court quietly sets aside the mode of payment contemplated by the law. There are

320     COURT OF APPEALS OF WEST VIRGINIA.

July Term,     Goshorn et al. vs. Supervisors Ohio Co.     1865.

neither quotas nor instalments about the matter as it was arranged between them and the railroad company.

The legislature manifestly intended by the 42d section to impose a check which practically would guard, to some extent at least, against the abuse of the power they had granted. If the subscriptions had to be paid by loans, they could only be made when the county could borrow the money, and would be limited to the amount that could be borrowed for the purpose. Money lenders are proverbially cautious. They would not lend money to be squandered in wild and visionary enterprises. On the other hand, the statute contemplated that, if loans were not negotiated to pay for the stock, taxes should be levied on the people of the county "for the purpose of paying the quotas on said stock as they might be called for, or the instalments of such subscriptions as they might fall due;" subject to the limitation that the levy, for a year, should not exceed one-fifth of the whole amount of such subscription. A railroad company, engaged in constructing its road, would speedily call in the quotas on its stock. They always do so, we believe, as fast as the law allows. The people would at once feel the burden of taxation resulting from the subscription. The amount of subscription, if this provision of the law were fairly executed according to the intention apparent upon its face, would be limited to what could be collected from the people of the county, by a moderate rate of taxation for a short term of years. The justices, elected by the people, would scarcely venture on extravagant subscriptions, if immediate and onerous taxation of themselves and their constituents, was to be the necessary result.

The 1st section of chapter 61, provides that, " every company which, after the commencement of this act," [that is, after July 1st, 1850,] "shall be incorporated to construct any work of internal improvement, shall be governed by the provisions contained in the 57th chapter, and in this chapter, so far as they can apply to such company without violating its charter." (Code of 1849, page 316.)

Now, among the provisions of the 57th chapter, are the

following, respecting subscriptions to stock: (Code of 1849, pages 299, 300.)

The second section relates exclusively to subscriptions of stock to banks of circulation. The third section then proceeds "upon every subscription for shares in any joint stock company not provided for by the preceding section, there shall be paid upon each share two dollars at the time of subscribing, and the residue thereof as required by the president and directors."

But the county court made an entirely different arrangement from that intended by the law. By their orders of June term, 1851, and June term, 1852, subscriptions are directed to the amount of 300,000 dollars to the stock of the railroad company, *not* payable two dollars a share at the time of subscribing, and the residue in *quotas* or instalments as called for or agreed upon, provided that the court should not be required to levy more than one-fifth of the amount in any one year; *but* "payable in coupon bonds of the county, which shall be made payable to said company *or its order*, at twenty years from their date, with interest payable semi-annually."

We have attempted to establish the following propositions:

1. That the *Hempfield Railroad Company* never was incorporated under the laws of *Virginia*, within the intent and meaning of the 61st chapter of the Code.

2. That the county court had no authority in law to subscribe for the stock of any railroad or turnpike company, unless it was a joint stock company incorporated under the laws of *Virginia*.

3. That even if the county court had authority to subscribe for the stock, they had no authority in law to make or issue for such stock, the twenty year coupon bonds exhibited by the complainants.

If we have established the first and second propositions, they are conclusive of these causes. If we establish the third, it alone, is conclusive. In either case, the bonds and coupons here exhibited, are null and void, because the

county court had no *capacity* to make such contracts. The law had not conferred on them the power to bind the county in the manner they attempted.

But we are compelled to notice another point. The complainants say that they are *bona fide* holders, without notice, and for valuable consideration—and that these instruments, though void in their inception, are valid securities in their hands. Let us examine this pretension on their part.

Are they *bona fide* holders without notice?

The bonds all set forth upon their face, that they are issued "under the authority granted in the 61st chapter of the Code of *Virginia.*" The parties are notified by the very instrument under which they claim that the only authority which the county court had to pledge "the faith of the county," and the property of its inhabitants, was this 61st chapter.

But even this was not necessary. A public statute is notice to the world. No one in a court of justice is allowed to allege ignorance of it; and least of all, while he claims under it. The foundation of the complainants' claim is the statute. It is the only evidence that these bonds and coupons were authorized by law, and are, therefore, binding on the tax-payers of the county. As they claim under the law, they must claim according to it. (11 Gratt., 288–9, *Stainback* vs. *Read & Co.*; 1 Parsons on Notes and Bills, 119; *East Anglian Railway Co.* vs. *the Eastern Counties Railway Co.*, 7 Eng. Law & Eq. R., 508; *Balfour* vs. *Ernest*, 5 Jurist, New Series, p. 439; *Pierce* vs. *the Madison & Indianapolis Railroad Co.*, 21 Howard, 441; *The Commissioners of Knox county, Indiana* vs. *Aspinwall*, 21 Howard, 539; *Smith* vs. *Milwaukee and Lake Superior Railroad Co.*, Am. Law Reg. for September 1861, p. 659.)

No question of negotiability can, by any possibility, affect the defense here set up. It is a question of the capacity of the obligor. Had the county the legal authority to make the contracts now sought to be enforced? This is the matter about which we are now disputing. If we are correct in the position we have assumed, that no such

authority was given, the bonds and coupons exhibited by the complainants were invalid in their inception, and no transfer can impart life and validity to them. (1 Parsons on Notes and Bills, page 67, note f; *Root* vs *Goddard*, and *Root* vs. *Wallace*, 3 McLean's Rep., 102, and 4 Id., 8; 3 McLean's R., 103; *Wiggin* vs. *Bush*, 12 John. R., 310.)

BROWN, J. The first question to be considered is, is the Hempfield Railroad a corporation within the meaning of chapter 61, and sections 38 to 43 of the Code of 1849? No particular form of words is necessary to create a corporation: Angell and Ames on Corporations. In this case it was not the creation of a new corporation, but the conferring of corporate powers and privileges by Virginia upon a Pennsylvania corporation already existing. This was done by the act of March 14th, 1851, and as effectually done, for every purpose within the object and intent of that act, as if it had incorporated the same persons anew for that purpose. It contemplated the same securities to the citizens of Virginia as if the act had created a new corporation for the purpose. It was really a great advantage gained to confer the powers and privileges requisite to accomplish the work in question, instead of creating a new company for the same purpose, because the right of way, powers and privileges vested by Pennsylvania in the Hempfield company, were thereby secured; and the extension and completion of the road more certainly effected. To make a railroad to the Pennsylvania line, was not the sole object in view, for that would be worse than dead capital, as its proceeds would not keep it up. It was absolutely essential that it should be made further, and that could not be done without the aid and consent of the other State, which could scarcely have been secured while the Hempfield company was in the field; but by conferring the powers and privileges requisite, upon the Hempfield company, the object was at once accomplished, and foreign and material aid secured. Such was precisely the case with the Baltimore and Ohio railroad company, and though the act conferring on that company

the powers and privileges requisite to effect the object in view, *i. e.* the construction of that important line of railway through the State, was somewhat more full and particular, yet it is believed that the act of March 14th, 1851, conferred all the powers and privileges requisite to effect the end in view to wit: the construction of the railroad through the State, as effectually as did the Baltimore and Ohio act. And the court of appeals in 12 Grat. held the Baltimore and Ohio company to be a Virginia corporation. It is therefore held, 1st, That the act of March 14th, 1851, conferred upon the Hempfield company such rights and privileges as to make it a corporation of this State within the meaning of the sixty-first chapter of the Code of Virginia, 1849, and therefore competent to receive the subscriptions to its stock by Ohio county as provided in said sections; 2nd, That the subscriptions by the county court of Ohio county, and the bonds executed in pursuance thereof in payment of said subscriptions, are valid and binding, because the court had authority to do so; and any irregularity in the manner of executing that power is foreclosed by the judgment of the court and the execution of the bonds.

BERKSHIRE, President. The decision of this case is important on account of the amount involved, and also, because, as we are informed, it is to close a controversy between the numerous bond holders and Ohio county, of many years standing.

The defendants resist the payment of these bonds, upon the ground that the late county court of said county had no competent authority to make subscriptions to the stock of the Hempfield railroad company; and, *first,* because it is not a Virginia corporation within the meaning of the 61st chapter of the Code of Virginia of 1849; and, *second,* that if it *is* such a corporation, yet still, the powers conferred on the county court of Ohio county have not been carried into effect in the mode prescribed in said chapter, but was departed from in many essential particulars.

As to the first objection. No particular or precise form of words, it will be found, is necessary in the *creation* of a corporation, but it may result from implication and intendment. It is the grant of certain powers and privileges and the imposition of the necessary restrictions, which constitute the main elements of a corporation, and as it is always a question of intention, the formal words, "erect, establish, incorporate," &c., usually found in the acts of incorporation are not deemed essential. And it has accordingly been held in at least one of the States (Arkansas,) that an act of the legislature creating a bank by-name, and putting the funds under the control of certain designated persons without any express words of incorporation, was sufficient to constitute it a corporation, the powers, &c., conferred on them for the purpose, says the court, cannot exist without a corporation: Angell and Ames on Corporations, 64, 65 and 66.

Applying these general principles to our case, I think there can be no doubt but the act of the 14th of March, 1851, constituted the Hempfield railroad company a corporation. But if it were left at all in doubt, the case of the *Baltimore and Ohio Railroad Company* vs. *Gallahue's adm'r*, 12 Gratt., 655, is, I think, conclusive on the question. The acts authorizing the two companies to construct their respective roads through the territory of Virginia, it seems to me, are, in every essential respect, very similar.

The act of the 8th of March, 1827, authorizing the Baltimore and Ohio company to construct their work through Virginia, recites that the company had theretofore been duly incorporated by the legislature of the State of Maryland, and sets out the act *in hæc verba*, and then grants to the company all the rights, powers, privileges, &c., in Virginia, which it derived under the act of the corporation of Maryland, and subjects it to all the duties, penalties and restrictions imposed by that act, and reserves to the State of Virginia and her citizens the same rights, privileges and immunities which are reserved to the State of Maryland or her citizens.

The act of the 14 of March, 1851, authorizing the Hemp-field Railroad Company to continue and construct their road through Ohio county in Virginia, also recites the fact that said company had been previously duly incorporated by an act of the legislature of the State of Pennsylvania, and without reciting that act, provides that the said company, as to all their rights, property, franchises, powers, duties and obligations (terms applicable alone to a corporation and not to a *private* company, within the State of Virginia,) shall be governed by, and subject to, all the provisions of the Code of 1849.

Now it is not the recital in detail, merely, of the act of incorporation by the legislature of the State of Maryland, contained in the act of the 8th of March, 1827, which consti-tuted the Baltimore and Ohio company a Virginia corpora-tion, but it was the "grant of the powers," &c., and the imposition of the necessary restrictions which follow this recital which had that effect.

In delivering the opinion of the court in the case of the *Baltimore and Ohio Railroad Company* vs. *Gallahues' adm'rs*, before cited, judge Allen, after referring to the last men-tioned act, says, "the company, under this law, is a Virginia corporation and its powers within the territory of Virginia are derived from the grant contained in the Virginia law."

And again, he remarks, that, "throughout its whole course vast expenditures would be necessary, in the con-struction, preservation and working of the road; innumera-ble contracts would be entered into, controversies would necessarily arise out of the contracts, acts and omissions of the company and its agents; and it would be a start-ling proposition if in all such cases, citizens of Virginia and others should be denied all remedy in her courts for causes of action arising under contracts and acts entered into or done within her territory; and should be turned over to the laws of a sister State to seek for redress. Such a con-struction would give the company almost immunity for its contracts and acts over most of the road, and would exempt its property in the territory of Virginia from all liability to

its creditors; for process of execution from the courts of Maryland could not avail in Virginia."

Now this reasoning it appears to me, applies in all its force to the Hempfield railroad company; for although a foreign corporation, in some cases, might institute and prosecute suits in this State, yet it is certain that it could not be sued within the State.  I conclude, therefore, that the act of the 14th of March, 1851, constituted the said Hempfield railroad company, a domestic or Virginia corporation, and that the legislature did not intend otherwise, by committing the absurdity of requiring said company to operate within the territory of Virginia as a private-company merely, and on the other side of the State line as a corporation.

We come to the second objection, namely, the various alleged irregularities in the execution of the powers vested in the county court of Ohio county.

The general rule, according to the numerous authorities cited and relied on by the counsel of both parties to this controversy, certainly is, that a party acting under a power must pursue the power with much strictness, and where the mode or manner of executing the power is indicated in the act or instrument creating the power, the mode must not be departed from in any essential respect.  From a careful examination of these authorities, however, I am of opinion that there was no substantial variance or departure from the powers vested in the county court in issuing the bonds in controversy—certainly none such as would, in my judgment, justify us in holding them void in the hands of *bona fide* holders.

The acts conferring the authority, it will be seen, contain no restrictions on the power of the court to subscribe the stock to a certain amount nor on the manner of making it, or the mode of payment.  But the only restrictions found in the acts are as to the mode of levying taxes, (and the annual amount,) for the payment of such stock.  This latter question, however, is not now before the court and it would, therefore, be improper to express an opinion upon it.

The company, as I think, sufficiently signified its accep-

tance of the charter when it took the subscriptions to its stock and received the bonds issued in payment of the same. I think the petitioners are entitled to the writ of peremptory mandamus prayed for, and the same must be awarded.

WRIT GRANTED.

JUDGE HARRISON *having declined to sit, as before noticed, the cases were heard and determined by the two remaining judges whose opinions are just given.*