## COMM'RS OF LEAVENWORTH CO. v. EDWARD MILLER.

1. MUNICIPAL AID TO RAILROADS—*Legislative Power to authorize—Question of Law.* The question whether the legislature possesses the power to authorize counties to grant aid to railroad companies by subscribing for stock therein, and issuing bonds in payment therefor, when it comes to the courts is purely a legal question, and the courts have nothing to do with the wisdom or policy of such legislation.

2. LEGISLATIVE POWER—*Its source and extent; Powers of the People.* The legislature have no inherent power, but all their power is derived from the people through the constitution of the State. The people, in their primary capacity, possess all the political power of the State, and may themselves authorize counties to grant aid to railroad companies; or they may, if they choose, delegate this power to the legislature, and allow the legislature to grant such authority to counties.

3. —————— *Limitation.* The legislature cannot exercise any power retained by the people, or not delegated by the people to the legislature.

4. GENERAL LAWS—*Uniform operation throughout the State.* Where the provisions of an act are designed for the whole State, and every part thereof, such act has, in contemplation of section 17, article 2, of the constitution, a uniform operation throughout the State, notwithstanding the condition or circumstances of the State may be such as not to give the act any actual or practical operation in every part thereof.

5. INTERNAL IMPROVEMENTS; *Constitutional inhibition construed.* Section 8, article 11, of the constitution, which prohibits the State from ever being a party in carrying on any works of internal improvement, applies to the State in its sovereign corporate capacity, and not to the subordinate political subdivisions thereof. It prohibits the State as a State, and not counties, from being parties in carrying on any works of internal improvement.

6. COUNTIES; *Stockholders in Railroad Corporations.* There is no express provision of the constitution which prohibits the legislature from authorizing counties to become stockholders in railroad companies, and issuing their bonds in payment for such stock.

7. AID TO RAILROADS—*Validity of Statutes, and Bonds.* Chapter 12 of the Laws of 1865, and other acts passed by the Legislature of the State of Kansas authorizing counties and cities to subscribe for stock in railroad companies, and issue bonds in payment of the stock so subscribed for, are constitutional and valid.

Leavenworth County v. Miller.

8. STATUTES; *Constitutionality; Presumption.* All presumptions are in favor of the constitutional validity of a statute, and before the courts can declare it invalid, it must clearly appear to be unconstitutional.

9. GENERAL LEGISLATIVE POWER—*Grant of, where found.* The power of the legislature to pass an act granting municipal aid to railroad companies must be found in the general grant of legislative power under section one, article two, of the constitution, which provides that the legislative power of the State shall be vested in the legislature, or not at all.

10.———— *The term "Legislative Power," includes the power to authorize Municipal Aid to Railroad corporations.* At the time the constitution was framed, the term "legislative power" had a definite and precise signification with reference to this question, established by legislative, executive, and judicial construction, practice and usage, and the general understanding of the people throughout the United States, which general understanding and signification was, that said term included the power to authorize municipal aid to railroad corporations; and therefore, in the absence of anything to the contrary, it must be presumed that the people of this State, when they framed their constitution, used said term with the signification generally given to it, and therefore that they intended to give to the legislature the power to pass acts authorizing municipal aid to railroad companies.

11.———— *Courts must construe, not amend, the Constitution.* If it was the intention of the people that the constitution should give to the legislature the power to pass acts authorizing municipal aid to railroads, that instrument must be so construed by the courts; and the courts have no power to amend it, or change any of its provisions, or insert any new provisions in it, through the means of judicial construction or interpretation.

12. AID TO RAILROAD CORPORATIONS—*For what purposes given.* The aid given to a railroad company is not strictly for a private purpose, nor wholly for a public purpose, though the object intended by the legislature is a public purpose.

13.———— *Public purposes, how accomplished; ultimate object, and how determined.* The government may accomplish a public purpose through the means of a private agency, a private individual or individuals, or a private corporation. It is the ultimate object to be obtained which must determine whether a thing is a public or a private purpose. The ultimate object of the government in granting municipal aid to railroads, is to increase the facilities for travel and transpor-

tation from one part of the country to the other, which object is in its nature a public purpose.

14. ———— *Taxation, for what purposes.* Taxation is the most universal power possessed by governments, being an incident and auxiliary of every other power, and may be resorted to whenever it is necessary to accomplish a public purpose, or to carry out any other power granted to the legislature.

15. RAILROADS, *authorized and constructed for Public, and not for private purposes.* If a railroad is made absolutely free for every one who chooses to ride and transport goods upon it, it is to be deemed and held as constructed for a public purpose, notwithstanding the government may allow a (in other respects) private · corporation to own and operate it, and to receive a compensation therefor, provided it is a road for which the government exercises the right of eminent domain, and retains the right to limit or restrict the compensation for freight and fare.

16. MUNICIPAL AID—*Extent of, rule for determining.* The localities along the line of a railroad may be taxed to aid its construction and operation, if they choose to take stock therein and issue bonds thereto; and a fair rule of apportionment, of which the taxpayers cannot complain, is, to allow the localities to be taxed the privilege of saying how much the benefit of the improvements is worth to them, and for what amount they are willing to be taxed.

## *Error from Leavenworth District Court.*

CHAPTER 12 of the Laws of 1865, entitled "An act to "authorize counties and cities to issue bonds to railroad "companies," was approved February 10th, and took effect February 14, 1865. Sec. 1 of said chapter provided "That the board of county commissioners of any county, "to, into, through, from, or near which, whether in this "or any other State, any railroad is or may be located, "may subscribe to the capital stock of any such railroad "corporation, in the name and for the benefit of said "county, not exceeding in amount the sum of $300,000 "in any one corporation, and may issue the bonds of

31

Leavenworth County v. Miller.

"such county, in amounts as they may deem best, in "payment for said stock. * * * But no such bonds "shall be issued until the question shall be first sub-"mitted to a vote of the qualified electors of the county "at some general election, or some special election," etc. (Laws of 1865, p. 41.) The board of commissioners of Leavenworth county called a special election to be held June 30th, 1865, to determine by vote of the qualified electors of said county whether said board of county commissioners should subscribe $250,000 to the capital stock of the "Union Pacific Railway Company, Eastern Division," and issue the bonds of the county in payment for said stock. The notice of the election stated the question submitted to the electors to be, "whether the com-"missioners should issue $250,000 in bonds *to be expended* "*in the stock* of said railway company." The proposition having received a majority of all the votes cast at said special election, the county commissioners, on the 1st of August, 1865, made the subscription and issued the bonds. Series "A" of the bonds so issued, fell due in March, 1867. One of these bonds, of the denomination of $250, was assigned to *Edward Miller*, defendant in error, who presented it, after maturity, to the treasurer of Leavenworth county, and demanded payment, which was refused; he also presented it to the board of county commissioners, and demanded payment, but was refused. The county board had, at an earlier period, made an order directing the treasurer not to pay any of said bonds. *Miller* brought suit against *The Board of County Commissioners of the County of Leavenworth* to recover the principal and interest due on his said bond. The case was tried at the November Term, 1868, of the district court, when the plaintiff had judgment for $288.80. From this judgment *The Board of County Commissioners* appeal, and

they bring the case to this court by petition in error, the principal objection urged being, that said Ch. 12 of the Laws of 1865 is unconstitutional and void, and that said bonds were therefore issued without authority of law, and are void.

*Thomas P. Fenlon*, for plaintiffs in error:

1. It will not be contended that outside of the provisions of ch. 12, Laws of 1865, the county commissioners had any power or authority whatever to subscribe to the capital stock of the Union Pacific Railway Company, or to issue bonds in aid of such enterprise. Such acts would be beyond the usual and ordinary powers of such a tribunal. If said ch. 12 is valid, the board had no authority until the question was submitted to the electors of the county, whether they, the commissioners, should, "*in the name and for the benefit of the county*," subscribe to the capital stock of the Union Pacific Railway Company, Eastern Division. Was this question submitted to the electors of Leavenworth county? The record does not show such to be the fact. There was a question submitted, and that question was, "whether the commissioners should issue $250,000 in bonds, *to be expended* in the stock of the said railway company." The law did not authorize the submission of this question. The people could only authorize the commissioners to "*subscribe* to the capital stock," and that question was not submitted, and bonds issued without authority are void. *Comm'rs of Shawnee County v. Carter*, 2 Kas., 115.

It is a general rule that, when special ministerial authority is conferred by statute, it shall be strictly observed. 12 Iowa, 153; 13 Ohio St., 311; 23 N. Y., 440; 22 Ind., 88, 509; 38 Ill., 45.

2. But said ch. 12, Laws of 1865, is unconstitutional

and void. It purports to authorize subscriptions and bonds in aid of *private* corporations. We deny the right in any event, under the constitution of Kansas, to subscribe to the capital stock of the railway company, and pay for the same by taxation. Taxation is a mode of raising revenues for *public* purposes only; a tax must be imposed for a *public* and not a mere private purpose. 19 Wis., 624; 57 Penn. St., 438; 21 Penn. St., 168. Is money raised by taxation, which is to be paid over when collected, to the Kansas Pacific Railway Company, devoted to a *public*, and not a *private* purpose? Is said railway company a public or private corporation?

"The main distinction between public and private corporations, is, that over the former the legislature, as trustee or guardian of the public interests, has the exclusive and unrestrained control. * * Private corporations are created by an act of the legislature, which, in connection with its acceptance, is regarded as a *compact*, and one which, so long as the body corporate faithfully observes it, the legislature is constitutionally restrained from impairing." A. and A. on Corp., 22, 23.

Railroads are private corporations: Gen. Stat., ch. 23, p. 199, §5; p. 201, art. 6; 29 Ala., 221; 1 Bald., C. C., 205; 3 Har., 200.

Sec. 8, Art. 11, of the constitution of this State, provides that "The State shall never be a party in carrying on any works of internal improvement;" that is, the entire people of the commonwealth, *en masse*, shall not be concerned in any work of internal improvement. How then can any portion of said people be invested with a power denied the entire community? Can a part be greater than the whole? If counties can do what the State is forbidden to do in this respect, may they not, by the same species of logic and construction, be authorized

to exercise every other power denied to the State? 18 Wend., 70; 10 Wis., 257; 21 Penn. St., 181; 10 Wheaton, 50; 1 Ohio St., 94, 97, 101.

It is claimed that the weight of authority is favorable to such legislation as our act, ch. 12, laws of 1865. But many if not most of the cases quoted as authority, are decided in States the constitutions of which have no such prohibitory clause as ours has; and we submit the reasoning of the Iowa, Wisconsin and Michigan cases against the validity of such legislation has never been successfully answered.

Judge Redfield says, (2 Redfield on Rlys., § 230, note,) "For ourselves we are free to confess that we never could comprehend the basis upon which so many able jurists in this country have professed to perceive clearly the reasons for giving municipal corporations the power to become stockholders in railway companies. We have always felt it was one of those cases in jurisprudence where the wish was father to the thought." And Judge Dillon, Cir. Ct. U. S., in a review of *Whiting v. Sheboygan Railway Co.,* 25 Wis., 167, says, "the obvious tendency of the judicial mind" is against the power claimed; and Judge Cooley, in the late case in Michigan, *The People ex. rel. The Detroit & Howard R. R. Co. v. The Township Board of Salem,* says "The best judgment of the legal profession has always been against the lawfulness of this species of railroad aid, and there has been a steady and persistent protest, which no popular clamor could silence, against the decisions which supported it." 20 Mich., 452.

*E. Stillings* and *T. A. Hurd,* for defendant in error:

1. All the proceedings on the part of the commissioners of Leavenworth county in submitting the question to the electors, and making such subscription and issuing

and delivering said bonds, were in compliance with the statute, ch. 12, 1865, p. 41. The notice for the election was sufficient, and in full compliance with the statute. A mere irregularity in the election, or in the notice therefor, that does not deprive any voter of his franchise, does not avoid the election, and will not vitiate or affect the bonds issued under the authority of such election. 4 Seld., 67; 15 Ind., 395; 29 Illinois, 54, 406, 414; 10 Iowa, 161; 2 Redf. on Rlys., pp. 398, 399, 401, 403.

2. But the real question in this case is, whether the act of 1865, (ch. 12,) authorizing counties to subscribe for stock and issue bonds in payment of such subscriptions, in aid of railway corporations, is constitutional and valid.

We understand this question has been repeatedly adjudicated in this court, and the power of the legislature to pass the law under which the bond in suit was issued, affirmed. 2 Kas., 454; 3 Kas., 104. And in the case of *The State ex rel. Meier v. McCrillus, Treasurer, et al.*, 4 Kas., 250, which was an alternative mandamus issued by this court to compel the payment of bonds of the same series and issue of the bond in suit in this case, the court conceded the validity of the bonds, but based its decision upon another point in the case.

Art. 2, §§ 1, 21, and art. 12, § 5, of the constitution, are a sufficient warrant and authority to the legislature to pass the act in question, unless the power therein granted is limited or revoked by art. 11. We contend that art. 11 was intended as a limitation of power in relation to the State and its affairs, and has no application to the municipal corporations, which the legislature is authorized to create, and that there is not in that article anything which in any way attempts to limit legislation in relation to municipal corporations.

All that the law in question attempts is, to provide a

way in which the people of a county or city may decide
for themselves whether they, in their corporate capacity,
will become stockholders in these *quasi* public corpora-
tions, and will tax themselves to pay debts contracted in
carrying out the purposes of such enterprises.

The State at large is not affected, except incidentally
and beneficially; nor is the State or the people of the
State at large in any manner called upon to contribute to
the payment of such debt.

At the time the constitution of Kansas was framed and
ratified, the courts of every State, with one exception,
(Iowa,) in which the question had been litigated, had de-
cided in favor of the validity of such laws as that in ques-
tion; and now the decisions of the highest courts of a
majority of all the States stand in favor of and sustaining
the validity of such laws, while two only (Iowa and Mich-
igan,) are recorded against them. Is it not fair to pre-
sume that our constitution was framed in view of these
judicial decisions, and that the people, in adopting it,
adopted the construction which had been given to similar
constitutions and statutes elsewhere?

The opinion of the court was delivered by

VALENTINE, J.: This action was commenced by the
defendant in error, in the court below, to recover from
the county of Leavenworth a sum of money claimed to
be due upon a certain bond of said county. This bond
is for the sum of $250, and is one of a series of bonds
amounting in the aggregate to the sum of $250,000,
issued by said county to the Union Pacific Railway Com-
pany, E. D., in payment for a like amount of the capital
stock of said company. This bond was issued August
1st, 1865, under an act of the legislature authorizing
counties to subscribe to the capital stock of railroad com-

panies, and to issue bonds in payment therefor, approved February 10th, 1865; (Laws of 1865, page 41.) And the principal question in this case is, whether the legislature had the constitutional authority to pass said act.

This case was submitted to this court with but very little argument concerning the constitutionality of said act; but since its submission two other cases, (*The State, ex rel., St. Joseph & Denver Railroad Company v. The Commissioners of Nemaha county;* and *Morris, et al., v. The Commissioners, etc., of Morris county*,) involving the same question, have been submitted to us, in which able and exhaustive arguments have were made by able counsel on both sides. We shall, therefore, not only consider the points made by counsel in this case, but will also consider the points made by counsel in the other two cases, so far as they have any application to this case. In the first of said cases, which is an application for a writ of mandamus, we shall in connection with this case deliver an opinion and allow an alternative writ of mandamus to issue. In that case as in this we affirm the constitutionality of said act, but in that case we shall leave all other questions to be decided upon the return of the alternative writ.

This is beyond all comparison the most important question ever brought before this court for decision. While it is true that the amount involved in this particular controversy is comparatively small, yet the decision in its ultimate consequences involves millions of dollars. Fabulous amounts of county and municipal bonds have already been issued and thrown upon the market with a profusion and prodigality bordering on recklessness and culpable extravagance, "and the end is not yet." And this decision in its ultimate consequences determines the validity or invalidity

1. Bonds in aid of railroads; legislative power to authorize is a question of law.

of all these bonds. But our duty is plain. The question presented to us for our considrration is purely a legal question. We have nothing to do with the wisdom or the policy of issuing such vast amounts of county and municipal bonds. That belongs to the legislature, and the people who vote to issue them. We simply determine whether the legislature had the *power* to authorize their issue; and not whether they acted wisely or unwisely in exercising such power. We are not the guardians of the legislature in this respect, nor of the people who vote to issue bonds; nor are we responsible for their acts, whatever may be the consequences.

We suppose that it will be conceded by every one that the legislature have no *inherent* power of any kind; that they possess no power except such as is delegated to them by the people; and that unless the constitution of the State authorizes them to enact such a law as the one now under consideration, they had no authority to do so. On the other hand, we suppose it will be conceded that the people are the original source and fountain of all civil and political power; that in their primary capacity they are supreme; that they had ample authority to exercise all of this power themselves, or, if they so chose, to delegate the same exclusively to the legislature. In short, we suppose it will be conceded that the people had full power and authority to delegate to the legislature all the power necessary to pass said act. The question then, is, not whether the people had the power to authorize the legislature to pass said act, for that must be conceded; but it is, whether the people actually did so authorize the legislature to pass such acts. The counsel who claim that said act is unconstitutional, have seen fit to call our attention to certain sections of the constitution with which (and with

these only, as we understand) they claim that the act is in direct contravention. We shall therefore first examine 'said sections before we proceed to examine the main question in this case, which is whether the people have, through the constitution, granted sufficient power to the legislature to pass said act. The sections of the constitution which are supposed to prohibit this species of legislation, are as follows:

BILL OF RIGHTS, § 20: " This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people."

ART. II, § 17. " All laws of a general nature shall have a uniform operation throughout the State."

ART. XI, § 8: " The State shall never be a party in carrying on any works of internal improvement."

We have no provision in our constitution as there is in the constitutions of most of the States, requiring that private property shall not be taken except by " due process of law," or by " due course of law," or by the " law of the land," or " for public use without just compensation." The nearest that anything in our constitution comes to it is as follows:

BILL OF RIGHTS, § 18: " All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

ART. XII, § 4: " No right of way shall be appropriated to the use of any corporation until full compensation therefor be first made in money, or secured by a deposit of money, to the owner, irrespective of any benefit from any improvement proposed by such corporation."

We do not suppose that these omissions from our constitution affect in the least any question involved in this case; but their omission explains the reason why counsel for plaintiffs in error have failed to make any point on them. (See Sedg. on Stat. and Const. Law, (1 ed.,)

501, *et seq.*) We can see no possible application that can

**3. Limit to legislative powers.** be made in this case of § 20, Bill of Rights. It will be admitted that without that section the legislature cannot exercise any power retained by the people or not delegated by the people to the legislature, and that is all that can be claimed with the section. And it is impossible for us to see that said section in any way enlarges the power of the court to nullify acts of the legislature.

We scarcely think it necessary to say anything with reference to § 17, art. 2 of the constitution. The act under consideration is so obviously in harmony with this

**4. Laws—uniform operation.** section, that the question attempted to be raised upon its supposed incongruity needs no elucidation from us. All the provisions of said act are expressly enacted for the whole State, and for every part of the State; and it is no more necessary that the same amount of stock be taken in each and every county of the State, in order that the act shall have a uniform operation therein, than that the same number of men shall be executed in each county of the State, in order that the law punishing murder in the first degree shall have a uniform operation throughout the State. Scarcely any of our laws have had any actual or practical operation out in the buffalo region, and yet it will hardly be contended that they are unconstitutional for that reason.

It is contended by counsel for plaintiff in error that, as by § 8 of article 11 of the constitution the State is prohibited from ever being a party in carrying on any works of internal improvement, each subordinate political subdivision of the State, such as counties, cities, towns, etc., must also necessarily be so prohibited. This construction of said section we think is erroneous, and arises from a misconception of the meaning of the word "State"

Leavenworth County v. Miller.

**15. Internal improvements, by State and counties. Constitution construed.** as used in this connection. We think the word "State" as here used means the people of the State as a sovereign corporation, and not the people of the State considered as individuals or minor and subordinate corporations. That it does not mean property or the territory of the State, all will admit; for such inanimate objects could not be *a party in carrying on* any work of internal improvement, or in carrying on anything else; and that it does not mean the people considered as individuals, or subordinate corporations, we think we can show. If it be claimed that said word means The State, in all its parts, it will lead to inextricable difficulties, and prove entirely too much. The people as individuals are the original elements out of which the State is composed, and each individual is as much a part of the State, as any corporation, public or private. And we suppose it will hardly be contended that the people of the State as individuals, could not engage in any work of internal improvement. But a distinction may be made between the people as individuals, and as organized into corporations. The people as individuals do not obtain their power from the State; their power is original and inherent, while the power of corporations is obtained entirely from the State, and is purely derivative and delegated. But whenever this distinction is resorted to, it is a virtual abandonment of the claim that the State is prohibited *in all its parts* from engaging in works of internal improvement, and it is setting up another claim, that the State is thus prohibited only in such of its parts as it itself creates. And this claim is equally untenable. A private corporation is wholly created by the State, as much so as a public corporation. It has no inherent power and does not exist of itself. It is an artificial being, invisible, intangible, and exists only in contempla-

tion of law. It is the mere creature and the creation of
the State in which it exists, and has no power of its own.
And cannot a private corporation engage in works of in-
ternal improvement? Nobody will say that it cannot;
and hence this claim must also be abandoned. But it
may be claimed that there is a distinction between public
and private corporations; that public corporations are
created solely for governmental and public purposes, and
that private corporations are created merely for private
purposes; and that while the State may effect purposes
through the agency of private corporations which it could
not effect directly through its own agency, yet that it cannot
effect any object through the agency of a public corpora-
tion which it could not effect directly through its own
agency; that it can perform just such acts and no more
through the agency of public corporations, as it could
perform directly through its own agency. The argument
drawn from this distinction is equally as fallacious as the
others. The State as a State is absolutely prohibited
from engaging in any works of internal improvement.
We will concede that this prohibition does not extend to
the building of a state-house, penitentiary, state univer-
sity, and such other public improvements as are used
exclusively by and for the State, as a sovereign corpora-
tion; but it does extend to every other species of public
improvement. It certainly extends to the construction
of every species of public improvement which is used, or
may be used by the public generally—by any and every
private individual who may choose to use it, such as
public roads, bridges, etc. (*Mayor, &c., of Wetumpka v.
Winter*, 29 Ala., 660.) Now, notwithstanding this pro-
hibition upon the State, notwithstanding that it is pro-
hibited from opening up or constructing any roads, high-
ways, bridges, ferries, streets, sidewalks, pavements,

wharfs, levees, drains, water-works, gas works, or the like, yet we find it authorizing public corporations to do so. And although it is prohibited from exercising the sovereign power of eminent domain in its own favor in opening up and constructing roads, highways, bridges, ferries, etc., yet we nevertheless find it exercising said sovereign power in favor of public corporations. Even a private corporation or individual cannot construct or operate a railroad over the land of another without the owner's consent, unless the State first so far becomes a party in carrying on such improvement as to authorize such private corporation or individual to take said land under the sovereign power of eminent domain. Hence we find that those who claim that the prohibition upon the State is also a prohibition upon all the public corporations of the State, are driven from every position they may assume. If they claim that it is a prohibition upon the State in all its parts, then they prohibit individuals from constructing internal improvements. If they claim that it is a prohibition upon such of its parts only as are created by the State itself—artificial persons—corporations—then they prohibit private corporations. And if they claim that the prohibition applies to public corporations and to them only, then they prohibit counties, townships, and road districts, from constructing roads, bridges, etc.; and cities, towns and villages, from constructing streets, sidewalks, drains, etc. But the end is not yet; there are still further and perhaps greater difficulties in the way.

6. Counties; authority to become stockholders in railroad corporations.

Sections 5 and 6 of the same article which prohibits the State from ever becoming a party to any works of internal improvement, provide that the State shall not contract debts to exceed one million of dollars, unless the same be authorized by a direct vote of the people.

Will it be contended that this prohibition embraces within its scope and operation, the subordinate political subdivisions of the State, as well as the State in its sovereign corporate capacity? It has never been so understood. The State has already gone to the full limit of one million of dollars in contracting public debts. Leavenworth county has probably gone as far. Many other counties and cities have also contracted large amounts of public debts, and if counties, townships, school districts, road districts, cities, towns, and villages, are all embraced within this prohibition—if the public debt of the State, including all its subdivisions, cannot, in the aggregrate, exceed one million of dollars, then a vast amount and number of illegal debts, have already been created in Kansas, and the whole people of the State have been continually and ruthlessly violating their own constitution in this regard. But if this prohibition, with regard to contracting public debts, is not an interdiction upon the political subdivisions of the State, how can it be said that the other prohibition is? Of course we recognize the maxim, *qui facit per alium, facit per se,* as embodying a sound principle of law; but it can have no possible application to the question now under consideration. It is true that no county or municipal corporation can construct or operate a railroad except by the authority of the State; but it is equally true, as we have already seen, that no private corporation or private individual can construct or operate a railroad over lands belonging to another without the owner's consent, except through the intervention and by the authority of the State; and no railroad has ever been constructed in this State except by positive authority given by the State. Now, if it be claimed that the State, by authorizing a county or municipal corporation to become a party in the construction

or operation of a railroad, thereby becomes a party to the same itself, then it must necessarily follow that the State, by authorizing a private corporation or private individual to become a party in the construction or operation of a railroad, must also necessarily thereby become a party itself in the construction and operation of such railroad. It is true, that in one sense the State becomes a party in the construction and operation of a railroad whenever it authorizes the same to be built, but not in the sense contemplated by the prohibition in the constitution. It was not the intention of the framers of the constitution to entirely exclude internal improvements from the State. It was not their intention to entirely prohibit the construction of the same. But it was only to prohibit the State *as a State* from being a party thereto. It left the State as free to authorize others, (that is, to authorize public or private corporations or individuals,) to construct internal improvements as though the prohibition had never been placed in the constitution. Several other States have provisions in their constitutions similar to the one we are now considering, and several courts have already construed such provisions. The decisions are uniform with the exception of one decision in Iowa, (*State v. Wapello Co.*, 13 Iowa, 388,) which decision has never since been followed in Iowa or elsewhere—all sustaining the construction that we have given to said provision : See *Cass v. Dillon*, 2 Ohio St., 607, 612 to 616; *Pattison v. Board Sup., Yuba Co.*, 13 Cal., 175, 182; *Clarke v. City of Janesville*, 10 Wis., 136, 170; *Bushnell v. Beloit*, 10 Wis., 195, 221; *Slack v. R. R. Co.*, 13 B. Monroe, 1; *Dubuque v. R. R. Co.*, 4 G. Greene, (Iowa,) 1, 3; *Clapp v. Cedar Co.*, 5 Iowa, 15; *Stewart v. Sup. Polk Co.*, 30 Iowa, 9; *Prettyman v. Supervisors, &c.*, 19 Ill., 406, 411; *Robertson v. Rockford*, 21 Ill., 451, 457; *City of Aurora v. West*,

9 Ind., 77 to 79; *Police Jury v. McDonough's Succes'n*, 8 La. An., 341; *New Orleans v. Graible*, 9 id., 561; Cooley Const. Lim., 216 to 219. In closing this branch of the case, we would say that the constitution means just what it says. It says the *State* shall never be a party in carrying on any works of internal improvement, and it means the *State*, and not *Leavenworth County ;* and to hold that this restriction upon the State is also a restriction upon counties, cities, etc., is to put words in the constitution which its framers omitted, and to overturn a well-settled rule of constitutional and statutory construction: *Expressio unius est exclusio alterius.*

On the side of the defendant in error, we have been referred to the following sections of our constitution :

ART. II, § 21. " The legislature may confer upon tribunals transacting the county business of the several counties such powers of local legislation and administration as it shall deem expedient." *

ART. XII, § 5. " Provision shall be made by general law for the organization of cities, towns and villages ; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power."

We do not suppose that these sections can in any way affect the decision of this case. No legislative power was exercised by the people or the county commissioners of Leavenworth county. (*L. M. & B. R. Co. v. Geiger*, 34 Ind., 220, *et seq.; C. W. & Y. R. v. Com'rs of Clinton Co.*, 1 Ohio St., 77 ; Cooley Const. Lim., 116 to 119, and authorities cited.) And § 5, art. 12, referred to, does not authorize *counties* to contract debts, loan their credit, etc., and it does not authorize either counties or cities, towns or villages, to contract debts, loan their credit, etc., in carrying on any works of internal improvement.

---

[* THE words, "*and administration*," are omitted from this section of the constitution in Gen. Stat. 1868, p. 45. They are found in the section as printed in Gen. Laws, 1860, p. 53, and Comp. Laws 1862, p. 56.—REPORTER.]

32

II. Having disposed of all the preliminary questions raised in this case, which were probably thrown in only as make-weights, and finding that there is no express provision of the constitution with which the said act is in contravention, we come now to the main question in the case, which is, whether the constitution of the State authorizes the legislature to pass such an act as the one under which the bond in controversy was issued. All there is of importance in this case is involved in this question. The question of whether an act of the legislature is constitutional or not, is now really before us.

*7. Statutes authorizing aid to railroads are constitutional and valid.*

The mere passage of the act is some evidence of its constitutional validity, for the legislature could not have passed nor the governor have approved the same, without impliedly, at least, declaring that the same was constitutional and valid. And this, both the legislature and the governor have done, after taking a solemn oath to support the constitution. We shall not claim however that this is the strongest kind of evidence in favor of the constitutionality of the act, for neither the executive nor the legislature are elected with special reference to their ability to expound the laws or the constitution. But with this in its favor, and looking only to this, we should not declare the act unconstitutional unless the reasons against its constitutionality at least preponderate over the reasons in favor of its validity. If the reasons are equally balanced we should certainly declare in favor of its validity. The rule governing courts in this respect is usually expressed in much stronger terms. It is generally said (and this is probably the true rule) that before an act of the legislature can be declared unconstitutional, its unconstitutionality must clearly appear. *State ex rel. Crawford v. Robinson,* 1 Kas., 18, 27;

*8. Statutes; constitutionality; presumption.*

*Atchison v. Bartholow,* 4 Kas., 124, 141.) But some courts have gone further, and said that its unconstitutionality must clearly appear beyond all reasonable doubt. (*Sears v. Cottrell* (per Christiancy, J.,) 5 Mich. 257, 261; *Twitchell v. Blodgett,* (per Cooley, J.,) 13 Mich., 162; *People v. Mahoney,* (per Cooley, J.,) 13 Mich., 501; Cooley Const. Lim., 182, and cases there cited.)

Judge Cooley says in his work on Constitutional Limitations, that "The rule of law upon this subject appears to be, that, except where the constitution has imposed limits upon the legislative power, it (the legislative power) must be considered as *practically absolute,* whether it operate according to natural justice or not." * * "Any legislative act which does not encroach upon the other departments of the government, being *prima facie* valid, must be enforced, *unless restrictions upon the legislative power can be pointed out in the constitution, and the case shown to come within them;"* (page 168.) "Nor are the courts at liberty to declare an act void, because in their opinion it is opposed to a *spirit* supposed to pervade the constitution, but not expressed in words," (page 171.) But if we should adopt the stronger rule laid down by courts, it would virtually cut off all further inquiry into the constitutionality of said act; for this court would hardly assume to declare, in the face of 25 or 26 legislatures that have enacted similar statutes, and 25 or 26 executives that have approved the same, and 25 or 26 supreme courts— state and federal—that have declared such statutes to be constitutional, that this act is clearly unconstitutional beyond all reasonable doubt, or even, that it is clearly unconstitutional.

But with reference to this particular statute the strongest rule in favor of its constitutionality should be adopted. All presumptions are in favor of its validity. It was not

passed through the hurry and bustle of hasty legislation; nor through inadvertance or oversight; nor through whim or capricious fancy; nor through the influences of party drill or party machinery; nor through chicanery, fraud or corruption; but it was passed after due deliberation and discussion. Besides, it is not an isolated statute, standing alone in questionable solitude upon the statute books of Kansas. Two-thirds of the legislatures of the Union have passed similar statutes, and two-thirds of the highest judicial tribunals of this country have declared them to be constitutional. And further, this statute in substance, though in some respects modified, still re-' mains upon our statute book, although it has passed the scrutiny of six subsequent legislatures since its first adoption. It has, of course, been declared and repeatedly declared constitutional by the legislative and the executive branches of the State government, for it has repeatedly obtained their sanction and approval. This, to begin with, is certainly very strong evidence in favor of its constitutional validity. It will be conceded that the constitution does not anywhere in definite and precise terms authorize the passage of said act, and it will be conceded that unless such authority is given by section 1, article 2, of the constitution it is not given at all. Said section reads as follows: "SEC. 1.–The legislative power of the State "shall be vested in a house of representatives and sen- "ate." The question then resolves itself into this: Was the passage of said act the exercise of legislative power? If it was, the act is of course constitutional; but if not, then the act is certainly unconstitutional. It is claimed that the passage of the act was not the exercise of legislative power, and therefore that the legislature transcended their authority in passing the same, and that the

9. Legislative power; grant of, where found.

act is void.  It is not claimed, as we understand, that
the legislature invaded the province of one of the other
departments of the government, but that it usurped
power which had not been delegated to any of the de-
partments, but was retained by the people.  As the peo-
ple have by the constitution clothed the legislature with
all the legislative power of the State, the first great ques-
tion is, what is "legislative power?"  This may be an-
swered by saying that it is the power to make the laws.
But then the question, equally difficult, arises, what is a
law?  This may be answered by saying that it is a rule
of civil conduct prescribed by the supreme power of a
State, which, under the constitution, and for this purpose,
is the legislature; and still we are left as much in the
dark as we were before.  Some things we know come
within the scope of legislative power.  Other things we
know do not.  But we have no rule by which we can
always determine accurately and precisely whether a
given thing comes within the scope of legislative power
or not.  Hence the difference of opinion we find among
eminent jurists.  We shall not attempt to give a defini-
tion of these words, nor prescribe a rule whereby it may
be determined in all cases what falls within and what
falls without the scope of legislative jurisdiction; but our
inquiry shall be devoted entirely to ascertaining whether
the authority granted to counties, and municipal corpo-
rations, to aid railroad companies by way of subscription
to the capital stock thereof, and to issue bonds in pay-
ment therefor, falls within or without the scope of legis-
lative authority.

That the people of the State had the authority to dele-
gate to the legislature all the power that the legislature
attempted to exercise in the passage of said act, we have
already assumed as conceded.  Hence, without being

embarrassed by the discussion of any collateral questions, we shall proceed at once to the consideration of what we consider the main question in the case—the meaning of the words " legislative power," or rather, what did the people understand those words to mean when they framed the constitution; for upon such meaning depends the whole question in controversy in this case.   That words have no positive or absolute signification in and of themselves—no inherent meaning—is a proposition too well understood by educated men to need exemplification or citation of authority.   That they are only conventional signs adopted by common consent and common usage to express certain ideas, and mean just what the people using them choose by common consent to make them mean, is too well settled to be disputed. And that they must always be presumed to mean, in the absence of anything to the contrary, just what they were generally understood to mean when they were used, is too near axiomatic to be controvered.   " The popular or received import of words furnishes the general rule for the interpretation of public laws as well as private and social transactions."   (*Maillard v. Lawrence*, 16 How., U. S., 251, 261; *Wetumpka v. Winter*, 29 Ala., 651, 660.)   And who could indulge the extravagant supposition that the framers of a constitution for the people of a young and growing commonwealth having vast possibilities before it, should use language in a sense never before so used, and in such a sense as must necessarily mislead the very people for whom it is framed, and upon whom devolves the duty and necessity of its correct interpretation? Nothing has been shown or can be shown that will tend in the least to prove that the words we are now considering were used in any different sense or were intended to have any different signification from that ordinarily given

*10. Term, "legislative power," considered.*

to them. / The question then is narrowed down simply to
this: What were these words generally understood to
mean at the time the constitution was framed? That
they had a general signification with reference to the
question now under consideration cannot be questioned;
for about two-thirds of the States, as well as the United
States, and the then territory of Kansas, had already
given to them a construction. The constitution of Kan-
sas was framed in 1859, and the State was admitted into
the Union under it in 1861, (January 29th.) At this
time, the meaning of these words, and the general scope
and authority of legislative power with reference to this
question, had become well-settled by legislative, execu-
tive, and judicial construction, practice, and usage. And
while no room is left to doubt that these words had a
general signification, no room is left to doubt what that
signification was. All the decisions of the courts were
one way, and in favor of the power of granting munici-
pal aid to railroad companies, and not a solitary decision
was at that time the other way.

As early as 1837, the question was settled, or at least
decided by a court of last resort in Virginia: *Goodin v.
Crumps*, 8 Leigh, 120; see also, in 1846, *Harrison Justices
v. Holland*, 3 Grattan, 236, a navigation case; in 1871,
*Langhorn v. Robinson*, 20 Grattan, 661; and 5 Call, 139.

In 1843 in Connecticut: *Bridgeport v. Housatonic R. R.
Co.*, 15 Conn., 475; see also in 1860, *Society for Savings
v. New London*, 29 Conn., 174.

In 1846 in Pennsylvania: *Harvey v. Lloyd*, 3 Penn. St.,
331; see also in 1849, *Commonwealth v. McWilliams*, 11
Penn. St., 62, a turnpike case; in 1853, the great case of
*Sharpless v. The Mayor of Philadelphia*, 21 Penn. St., 147;
*Moers v. The City of Reading*, 21 Penn. St., 188; in 1858,
*Commonwealth v. Com'rs Allegheny Co.*, 32 Penn. St., 218;

in 1861, *Commonwealth v. Pittsburgh*, 41 Penn. St., 278; in 1862, *Commonwealth v. Perkins*, 43 Penn. St., 400.

In Tennessee in 1848; *Nichols v. Nashville*, 9 Humph., 252, 271; see also in 1854, *L. & N. R. Co., v. Davidson Co.*, 1 Sneed, 637; in 1859, *Hord v. Rodgersville, &c., R. R. Co.*, 3 Head, 208; *Byrd v. Ralston*, 3 Head, 477; in 1869, *Justices of Campbell Co. v. The Knoxville & Ky. R. R. Co.*, 6 Coldwell, 598.

In Kentucky in 1849: *Talbott v. Dent*, 9 B. Monroe, 556; see also in 1850, *Justices, etc., v. P. W. & K. R. River Turnpike Co.*, 11 B. Monroe, 143; in 1852, *Slack v. Maysville & C. R. R. Co.*, 13 B. Monroe, 1; in 1859, *Maddox v. Graham*, 2 Metc., 56.

In Illinois in 1851: *Ryder v. A. & S. R. R. Co.*, 13 Ill., 516; see also in 1858, *Prettyman v. Sup. Tazewell Co.*, 19 Ill., 406; in 1859, *Robertson v. Rockford*, 21 Ill., 451; in 1860, *Johnson v. Starke Co.*, 24 Ill., 75; *Perkins v. Lewis*, 24 Ill., 208; in 1861, *Butler v. Dunham*, 27 Ill., 474; in 1862, *Clarke v. Hancock Co.*, 27 Ill., 305; *Piatt v. People*, 29 Ill., 54; in 1864, *Keithsburgh v. Frick*, 34 Ill., 405.

In Florida in 1852: *Cotton v. County Commissioners*, 6 Fla., 610.

In Ohio in 1852: *C. N. & Z. R. R. Co. v. Com'rs Clinton Co.*, 1 Ohio St., 77; *R. W. v. Treasurer N. Tp.*, 1 Ohio St., 105; see also in 1853, *Cass v. Dillon*, 2 Ohio St., 607; *Thompson v. Kelley*, 2 Ohio St., 647; in 1857, *State v. Van Horn*, 7 Ohio St., 327; in 1858, *State v. Union Tp.*, 8 Ohio St., 394; in 1861, *State v. Com'rs Hancock Co.*, 12 Ohio St., 596; in 1863, *Knox v. Nichols*, 14 Ohio St., 260; *Fosdick v. Perrysburg*, 14 Ohio St., 472; *Shoemaker v. Goshen Tp.*, 14 Ohio St., 569.

In Louisiana in 1853: *Police Jury v. Succession of McDonough*, 8 La. An., 341; see also in 1854; *New Orleans v. Graible*, 9 La. An., 561; in 1856, *Parker v. Scogin*, 11

La. An., 629; *V. S. & T. R. W. Co. v. Parish of Onachita*, 11 La. An., 649.

In Iowa in 1853: *D. & P. R. R. Co. v. Dubuque*, 4 G. Greene, 1; see also in 1854, *State v. Bissell*, 4 G. Greene, 328; in 1857, *Clapp v. Cedar Co.*, 5 Iowa, 15; in 1858, *Ring v. Johnson Co.*, 6 Iowa, 265; *McMillan v. Boyles*, 6 Iowa, 304; *McMillen v. Lee Co.*, 6 Iowa, 391; in 1859, *Whittaker v. Johnson Co.*, 10 Iowa, 161.

In Alabama in 1854: *Stein v. Mayor of Mobile*, 24 Ala., 591; see also in 1857, *Wetumpka v. Winter*, 29 Ala. 651; a plank-road case; in 1860, *Gibbons v. Mobile, &c.*, 36 Ala., 410.

In Mississippi in about the year 1854: *Strickland v. Miss. Central R. R. Co.*, not reported, but referred to in the case of *Williams v. Cammack*, 27 Miss., 224.

In North Carolina in 1855: *Taylor v. Newburn*, 2 Jones' Eq., 141, a navigation case; see also in 1858, *Caldwell v. Justices of Burk*, 4 Jones' Eq., 323.

In Missouri in 1856: *City of St. Louis v. Alexander*, 23 Mo., 483; see also in 1863, *Flagg v. Palmyra*, 33 Mo., 440; in 1867, *St. Joseph & C. R. R. v. Buchanan Co.*, 39 Mo., 485.

In New York in 1857: *Grant v. Carter*, 24 Barb., 232; *Benson v. The Mayor of Albany*, 24 Barb., 248; *Clark v. City of Rochester*, 24 Barb., 446; see also in 1858, *Bank of Rome v. Village of Rome*, 18 N. Y., 38; in 1859, *Gould v. Town of Venice*, 29 Barb., 442; in 1861, *Starin v. Genoa*, 23 N. Y., 439; in 1864, *Clark v. City of Rochester*, 28 N. Y., 605; in 1865, *People v. Mitchell*, 45 Barb., 208; in 1866, *People v. Mitchell*, 35 N. Y., 551.

In South Carolina in 1857: *Copes v. Charleston*, 10 Rich., 491.

In Georgia in 1857: *Winn v. Macon*, 21 Ga., 275; *Powers v. The Inf. Ct. of Dougherty Co.*, 23 Ga., 65.

In Indiana in 1857 : *Aurora v. West,* 9 Ind., 74 ; see also in 1860, *Evansville, &c., R. R. Co. v. Evansville,* 15 Ind., 395 ; in 1862, *Bartholomew Co. v. Bright,* 18 Ind., 93 ; in 1864, *Aurora v. West,* 22 Ind., 88.

In the United States Supreme Court in 1858 : *Commissioners of Knox Co. v. Aspinwall,* 21 How., 539 ; *Same v. Wallace,* 21 How., 547 ; see also in 1859, *Zabriskie v. R. R. Co.,* 23 How., 381 ; in 1860, *Bissell v. City of Jefferson,* id., 287 ; *Amey v. Alleghany County,* id., 365 ; *Com'rs Knox Co. v. Aspinwall,* id., 376 ; in 1861, *Woods v. Lawrence Co.,* 1 Black, 386 ; in 1862, 2 Black, 722 ; in 1863, 1 Wallace, 83, 175, 272, 291, 384, five cases ; in 1865, 3 Wallace, 93, 294, 327, 654, four cases ; in 1866, 4 Wallace, 270, 275, 535, three cases ; in 1867, 6 Wallace, 166, 210, 514, 518, four cases ; in 1868, 7 Wallace, 181, 313, two cases ; in 1869, 9 Wallace, 477.   (There are too many cases to give the titles to all of them.)

In Wisconsin in 1859 : *Clark v. Janesville,* 10 Wis., 136 ; also see in 1860, *Bushnell v. Beloit,* 10 Wis., 195.

In California in 1859 : *Pattison v. Board of Sup'rs of Yuba Co.,* 13 Cal., 175 ; also in 1860, *Hobart v. Sup'rs of Butte Co.,* 17 Cal., 23 ; in 1863, *Robinson v. Bidwell,* 22 Cal., 379 ; in 1864, *French v. Teschemaker,* 24 Cal., 518 ; *People v. Coon,* 25 Cal., 635 ; in 1865, *People v. Sup'rs of San Francisco,* 27 Cal., 655.

In Maine in 1860, *Augusta Bank v. Augusta,* 49 Me., 507·

In Kansas in 1864 ; in West Virginia in 1865 ; in Texas in 1866 ; in Nevada in 1869, and in ,Vermont in 1870. The decisions in the five last mentioned States are hereinafter cited.

But we are not left alone with the construction given to the term legislative power, by the legislative, executive, and judicial departments of other States and of the United States.   We have a construction of our own,

given to said term by the legislative and the executive departments of the then territory of Kansas before and during the time the constitution was being framed. In 1858 the legislature and the governor of said territory authorized the city of Atchison to subscribe for stock in and issue bonds to railroad companies: Private Laws of 1858, p. 182, §§ 30, 31. In 1859 the next legislature and the governor of said territory authorized Leavenworth county to make similar subscriptions and to issue bonds in payment therefor: Gen. Laws of 1859, p. 69; and on the same day (February 11, 1859,) they took the initiatory steps in framing the present constitution of the State of Kansas. On that day they passed the act under which the constitution was framed: Gen. Laws, 1859, p. 292; and on that day they gave a construction to the term "legislative power" with reference to municipal aid to railroad companies. And this construction the people have never overruled or repudiated in framing their constitution, or in any other manner, from that time till the present. In 1860, after the people had adopted the constitution, but while it was still pending before congress, and before the State was admitted into the Union under it, another territorial legislature and another territorial governor again determined in favor of the power of the legislature to pass acts granting municipal aid to railroad companies. They passed three acts recognizing this power—one for Leavenworth county, (Gen. Laws, 1860, p. 29,) one for Leavenworth city, (id., p. 32,) and one for the city of Atchison: (Private Laws, 1860, p. 53.)

We suppose that nobody will claim that the territorial legislature had more power in this respect than the State legislature. The territorial legislature had nothing but legislative power, and that is just what the State legislature have. The territorial legislature held their author-

·ity under the "organic act," which provides "that the legislative power and authority of said territory shall be vested in the governor and legislative assembly;" § 22.) The State legislature hold theirs under the State constitution. The organic act was framed by congress; the constitution was framed by the people of the State. The territorial legislature had all the legislative power in this respect that congress had power to give them. The State legislature have all the legislative power that the people of the State have power to give them. Then whose power is the greatest—that of the territorial legislature, or that of the State legislature? That of congress, or that of the people in the primary capacity? It has generally been supposed, and we presume it will be so conceded, that the power of the people in their primary capacity is unbounded, unlimited. Is it so with congress? Has any jurist ever said that it was so? Will any lawyer of any respectability hazard his professional reputation by declaring that it is so? We think not, and yet we shall not in the least question the power of congress upon this particular subject. In fact, this court has already decided that congress·possesses all the power necessary upon this particular subject. (*Burnes v. Atchison*, ·2 Kas., 454; *Atchison v. Butcher*, 3 Kas., 104.)

With all this before us, is it possible to come to any ·other conclusion than that the people knew what was ·generally understood by the term "legislative power," and that they adopted the constitution with that construction. "The constitution must receive an interpretation ·according to the sense in which the people are supposed to have understood its language." (*Mayor, &c., of Balt. v. State*, 15 Md., 376, 461; *Maillard v. Lawrence*, 16 How., U. S., 251, 261; *Wetumpka v. Winter*, 29 Ala., 651, 660.) The foregoing conclusion must also follow, because this

general understanding before and after the adoption of our constitution was a contemporaneous construction of said term: Cooley Cons. Lim., 67, *et seq.*, and cases there cited; *Portland Bank v. Apthorp*, 12 Mass., 257; and also because whenever a provision of law is adopted by one State from another, as this constitutional provision of ours was, the judicial construction given to it in the State where it originated, follows it to the State of its adoption: *Bemis v. Becker*, 1 Kas., 226, 248, 249; *Stebbins v. Guthrie*, 4 Kas., 353, 364; *Drennan v. The People*, 10 Mich., 175 to 177. But even the passage of said acts by our own territorial legislature before the adoption of the constitution is of itself sufficient in the absence of anything to the contrary to show that the people of the State intended to confer upon the State legislature power to authorize municipal aid to railroad companies; for as the territorial legislature had repeatedly exercised such power as legislative power, it must necessarily be presumed that the State legislature acting for the same community would also exercise such power as legislative power unless prohibited therefrom. But as there is no such prohibition in the constitution it must necessarily follow that the people of the State intended by leaving such prohibition out of the constitution, that the legislature should continue to exercise such power as legislative power: *Mayor, &c., of Balt. v. State*, 15 Md., 376, 461; 2 Gill & Johns., 284, 285. Laws in force at the time the constitution is framed must be considered as the ground-work and basis of the constitution itself. (See last case cited.)

Since the adoption of the constitution of this State, four or five other States besides those that we have already mentioned as having decided the question before our admission, have declared in favor of the constitutional validity of acts granting municipal aid to railroad

companies. Kansas: *Burnes v. Atchison*, 2 Kas., 454, decided in 1864; *Atchison v. Butcher*, 3 Kas., 104, decided in 1865; and *The State, ex rel. Hurd, v. The Mayor and Council of the City of Leavenworth*, not reported, decided in 1868. West Virginia: *Goshorn v. Sup. Ohio Co.*, 1 West Va., 308, decided in 1865. Texas: *San Antonio v. Jones*, 28 Texas, 19, decided in 1866. Nevada: *Gibson v. Mason*, 5 Nevada, 283, decided 1869. And the same doctrine has recently been recognized in Vermont: *Danville v. Railroad Co.*, 43 Ver., 144, decided in 1870—making in all about 27 States, and the United States.

All of the States have, impliedly at least, declared what we consider to be the true doctrine that the general grant of legislative power carries with it the power to pass acts authorizing county and municipal aid to railroad companies, and in some of the States the courts have expressly so decided: 2 Kas., 454, 486; 3 Wallace, 327, 654; 35 N. Y., 551; 24 Barb., 232, 248, 446; 4 Jones Eq., (N. C.,) 324; 10 Rich., (S. C.,) 495, 501.

III. The real question in this case is, whether the legislature has the constitutional power to authorize counties and municipal corporations to *subscribe for stock* in railroad companies, and to issue their bonds in *payment* therefor, and not whether the legislature have power to authorize counties and municipal corporations to make *donations* to railroad companies. In favor of the power to make subscriptions, etc., we have the decisions of about 26 States. Against the power we have the decisions of one State alone, and that is Iowa. The principal decisions in Iowa against this power are: *The State v. Wapello Co.*, 13 Iowa, 388; *Chamberlain v. Burlington*, 19 Iowa, 395; and *McClure v. Owen*, 26 Iowa, 243. But the Supreme Court of the United States has overruled all these decisions: *Gelpcke v. City of Dubuque*, 1 Wallace, 175; *Meyers v*.

*Muscatine,* id., 384; *Thompson v. Lee Co.,* 3 Wallace, 327; *Rodgers v. Burlington,* id., 654; *Riggs v. Johnson Co.,* 6 Wallace, 166; *Weber v. Lee Co.,* id., 210; *U. S. v. Council of Keokuk,* id., 514, 518; *Benbow v. Iowa City,* 7 Wallace, 313; *Lee Co. v. Rodgers,* id., 181. But it has been denied by very high authority that any decision has ever been made even in Iowa declaring the unconstitutionality of such acts as we are now considering: *Hansen v. Vernon,* 27 Iowa, 30, 78 to 80; *Stewart v. Supervisors of Polk Co.,* 30 Iowa, 10, 28, *et seq.* But admitting that such decisions have been made in Iowa, still the same court (as well as the supreme court of the United States,) in a more recent decision have swept away every vestige of the principle upon which the former decisions of the supreme court of Iowa are supposed to have been founded: *Stewart v. The Supervisors of Polk Co.,* 30 Iowa, 9; *King v. Wilson,* 3 Chicago Legal News, 137; 1 Dillon's Cir. Ct. Rep., 555. Hence no court of last resort can now be found, that holds that county and municipal aid to railroad companies by way of subscription to the capital stock thereof, is not a legitimate subject of legislation. There are however now just four decisions in the United States against the validity of *donations* to railroad companies; one in New York: *Stewart v. Hulbert,* 51 Barb., 312; one in Iowa: *Hansen v. Vernon,* 27 Iowa, 35; one in Wisconsin: *Whitney v. The Sheboygan R. R. Co.,* 25 Wis., 167; and one in Michigan: *The People, ex rel., v. Salem,* 20 Mich., 452. The first of these decisions is entitled to but little consideration as a precedent, as it was not rendered by a court of last resort. The second has since been overruled by the same court, (*Stewart v. The Sup'rs of Polk Co.,* 30 Iowa, 9.) This leaves two decisions only—one in Wisconsin, and one in Michigan, standing solitary and alone, in opposition to even this species of

Leavenworth County v. Miller.

legislation; and these are not authorities, as we shall presently see, against *subscriptions to the capital stock* of railroad companies. The supreme court of Wisconsin is composed of three judges, one of whom dissented. The supreme court of Michigan is composed of four judges, one of whom dissented. The court of appeals in New York, the court of last resort in that State, decide in favor of the validity of *subscriptions : Bank of Rome v. Village of Rome*, 18 N. Y., 38; *Starin v. Genoa*, 23 N. Y., 439; *Clark v. City of Rochester*, 28 N. Y., 605; *People v. Mitchell*, 35 N. Y., 551; and the court rendering the decision reported in 51 Barb., 312, acknowledge the binding force of the decisions made by the court of appeals, but claim that there is a material difference between donations and subscriptions; that they are not both governed by the same principles; that one may be valid and the other invalid. The supreme court of Wisconsin decides in favor of the validity of *subscriptions : Clark v. Janesville,* 10 Wis., 136; *Bushnell v. Beloit*, 10 Wis., 195; and against the validity of *donations : Whiting v. Sheboygan R. R. Co.*, 25 Wis., 167. In the latter case the court made two decisions, and in each decision they made a labored argument to show a distinction between subscriptions and donations, and to show that the former are valid and the latter invalid. (25 Wis., 186, 209.) See also note of Mr. Chief Justice Dillon, (who wrote the opinion of the court in the case of *Hansen v. Vernon*, 27 Iowa, 35,) published in the 9 Am. Law Reg., N. S., 172, 175.

We suppose that it will be admitted that it is a duty incumbent upon all governments to provide suitable and sufficient facilities for the travel and commerce of the country. Canals, roads, bridges, and other artificial means of passage and transportation from one part o the country to the other, have been made by the sovereign,

power and at the public expense, in every civilized State of ancient and modern times. And to-day this State constructs through the agency of subordinate public corporations all our common roads, bridges, and thoroughfares. In many parts of the civilized world, and particularly on the continent of Europe, (and in every part it might be done,) the railroads of the country are constructed, owned, and operated by the government. Many of the States of this Union have constructed, owned, and operated both railroads and canals, and their right to do so, so far as we are informed, has never been questioned. Some of the States are doing this very thing to-day, without the least suspicion that they are transcending the legitimate bounds of governmental jurisdiction. It must, therefore, be admitted that in the absence of constitutional restrictions, this State might construct, own, and operate, all the railroads within the boundaries of the State. It must also be admitted that whatever the State may do in providing artificial means of travel and transportation, it may do through the agency of subordinate public corporations, such as counties, cities, towns, and villages, which may be locally benefitted by such improvements. We have already seen that there is no constitutional restriction upon constructing works of internal improvement through the agency of subordinate public corporations, such as counties, cities, towns, and villages. Hence it logically follows that the State may, through the agency of such subordinate public corporations construct, own, and operate all the railroads within her territorial boundaries. It will also be admitted that the State may construct railroads through the agency of private corporations, or of private individuals. Now, if the construction of a railroad is a public duty which the State may either cause to be done entirely through the

33

agency of public corporations, and at the public expense,
or entirely through the agency of private corporations or
private individuals, it seems to follow as a logical con-
sequence that such a work may be done partly through
the agency of a public corporation, and partly through
the agency of a private corporation or of private indi-
viduals. If private enterprise will take hold of such
public improvements and construct them, all experience
has shown that it is better to let private enterprise do it.
But if private enterprise will only perform a part, is it
not better to let private enterprise perform that part, and
the public perform the other part, than that the public
shall be entirely deprived of all the benefits of such
necessary and valuable improvements? And further, if
a county should purchase all of the stock in a railroad
company, the county would then own the entire road,
and might, we presume, operate the same without any
grave constitutional objection being urged against such
a transaction. Then why may not the county purchase
a portion of the stock, and operate the road in conjunction
with the other stockholders, who are private individuals,
and who own the remainder of the stock?

While there is an obvious distinction between sub-
scriptions and donations, still we do not suppose that the
Wisconsin and Michigan decisions are founded entirely
upon the doctrine that donations to railroad companies
are illegal, simply because they are donations. The
power of governments and governmental organizations
to make donations, has been exercised ever since gov-
ernments were instituted, and, we presume, always will
be. Swords, banners, and other mementos for merito-
rious conduct, have always been, and, we suppose, always
will be donated by governments and municipal organi-
zations. Two hundred thousand dollars in money, and

a township of land, were donated in 1824 by the general government to General La Fayette. Millions of dollars as pensions, and millions of acres of land, and land warrants, have been donated to the soldiers of the republic since its organization. And the government is now generously donating artificial limbs to disabled soldiers who lost limbs in the war of the rebellion. During the rebellion, the general government, and almost every loyal State, county, city, township, and hamlet, gave bounties to soldiers enlisting in the service of their country. Bounties have been everywhere given for the destruction of wild beasts and other public pests. This State is now giving bounties to those who grow forest trees, plant hedges, and build stone fences. (Gen. Stat., 465, 1094.) Schools are made free for the poor as well as for the rich. Asylums are established for the deaf, dumb, blind and insane. Hospitals are opened in many parts of the world for the sick, the diseased, the disabled, and the infirm. The poor and the destitute are fed and clothed at the public expense. Homesteads are given by the general government to actual settlers upon the public lands. And many millions of acres of the *public lands* have been *donated to railroad companies* by the general government within the last thirty years. If the Wisconsin and Michigan courts had simply said that *donations* to railroad companies were illegal because they were *donations*, their decisions would not affect this case in the least; but they have gone farther, and have said that they are illegal because they are given to railroad companies. The reasons given why donations to railroad companies are illegal are, *first*, that railroad companies are *private* corporations, (forgetting of course that such donations as are everywhere admitted to be legal, are nearly always given to *private* corporations or to *private* individuals;)

and *second*, that said donations are given for a *private purpose*. Now whatever may be the case with reference to municipal aid to railroad companies being a private purpose, in Wisconsin or Michigan, we think we have already demonstrated that such is not the case in Kansas; that the people of Kansas, in their primary capacity, in framing their constitution have determined otherwise, and as we shall attempt to show have determined rightly. But whether rightly or wrongly, from the people in their primary capacity there is no appeal. Their decision is final. Whatever they have determined in and by their constitution, we must determine. We are not above the constitution. We as judges are the mere creatures of it, and hold our authority under it, and from it, and must decide as it decides. Any other course would be usurpation. If we do not carry out the provisions of the constitution as the people understood them when they framed it, we are unworthy to hold the places we fill. It can hardly be supposed that when the people framed their constitution they intended to bring into existence a tribunal greater than the constitution itself; a tribunal with such potential force that it could destroy the provisions of the instrument upon which its own life and existence depends. It has heretofore been supposed by statesmen and jurists, that the constitution was a permanent and inflexible instrument; that it was the photograph of the people's *will*, indelibly fixed, and could only be amended by the people themselves in the prescribed form. It has heretofore been supposed that if a new truth, however valuable, should be discovered, the courts, however strong the temptation might be to startle the world with the announcement of it, would have no right to insert it in the constitution by judicial construction, or interpretation, but must wait and let the people

11. Courts must construe, not amend, the constitution.

in their own proper time, make the desired amendment. And even where a society has outgrown its constitution it has never been supposed that the courts could, through the means of judicial construction so amend it, as to bring it up to the wants and needs of the more improved and further advanced condition of society.

We deny both the grounds on which it is claimed that municipal aid to railroad companies is unconstitutional. We deny that railroad companies are *strictly private* corporations, although we do not claim that they are strictly public corporations; and we deny that municipal aid to railroad companies is *strictly for a private use*, although we do not claim that it is wholly for a public use, though the object intended by the government is a public purpose; and we further say that it makes no difference, so far as this case in concerned, whether a railroad company, as a company, is a *private* corporation or not. The whole question depends upon the ultimate object, use, or purpose, intended by the government in granting the aid to railroad companies—whether that object, use, or purpose is public or private, and not upon the nature or character of the means used in effecting or accomplishing that object.

12. Aid to railroads, for what purposes.

13. Ultimate object determines purpose.

This whole question has been argued as though it depended entirely upon the sovereign power of taxation. We do not think that it does, but as it has been so argued, we cannot well escape discussing the question to some extent in the same manner. The argument for plaintiffs in error in substance is this: 1.—The dividends on the railroad stock which the county gets for its bonds, together with the stock itself, and all other resources of the county aside from taxation, will not pay the interest and principal of said bonds as the same become due;

therefore the county will have to resort to taxation in order to pay said interest and principal. 2.–Taxation can only be. resorted to for a public purpose. 3.–A railroad company is a strictly private corporation, and subscribing for stock therein and issuing bonds thereto, is a strictly private purpose. 4.–Therefore such subscriptions, etc., are unconstitutional. Now, we admit the first and second of these propositions, and deny the third and fourth.

14. Taxation, for what purposes. And we might here say that we admit what are claimed to be the three fundamental principles of taxation : 1st, Taxation must be for a public and not merely a private purpose. 2d, The taxes must be properly apportioned. 3d, The district taxed must have a special interest in and be specially benefitted by the thing for which the taxes are levied. Taxation is not an independent power to be exercised aside from the other powers of the government. No society of men ever organized into a government, or into a municipal corporation, for the mere purpose of taxing themselves. The power of taxation can never be invoked except in aid of one of the other powers. It is not of itself a sufficient foundation upon which to build any other power or action of the government. It is only a servant of the other powers, and can only be exercised in their support. And if the right to make county and municipal subscriptions to railroad companies is founded upon no other power except the power of taxation, we admit it has no foundation whatever, and must of course fall. But on the other hand, if it be conceded that every other objection to the making of said subscriptions is removed— that nothing else stands in the way—that everything else is favorable—that the right of the government is otherwise perfect—then everything is virtually conceded, for the power of taxation (or the want of such power,) can

never be in the way of the exercise of any of the other powers of government, but must always, when necessary, contribute thereto. The power of taxation is the most universal power possessed by governments. It is coextensive with every other power—it is an incident, a concomitant, an auxiliary of every other power. Whenever the government can act at all it can resort to the power of taxation if necessary to make its action effective. And although the government has no right to interfere in private affairs at all, yet whenever the public interest, the public honor, the public gratitude, or public charity requires it, the government may resort to its sovereign power of taxation without limit, until its interest, its honor, its gratitude, or charity is entirely satisfied. Then it is that the power of the government, and the power of the legislature acting for the government, becomes unbounded; for the courts, whose duty it is simply to expound and declare the law, have no scales by which to determine the amount of the public interest, the amount of the public honor, the amount of the public gratitude, or the amount of the public charity, which will support and sustain taxation. This duty rests upon another branch of the government—the legislature; and it rests wholly in their discretion. That these views are correct we refer to the following authorities: Cooley Const. Lim., 219, *et seq.*, and cases there cited; id., 479, *et seq.*, and cases there cited; id., 129, 488; *Town of Gilford v. Sup. Chenango Co.*, 13 N. Y., 143, 149; *Booth v. Woodbury*, 32 Conn., 128; *Broadhead v. City of Milwaukee*, 19 Wis., 652; *Speer v. School Directors of Blairsville*, 50 Penn. St., 150; *Waldo v. Portland*, 33 Conn., 363; *Bartholomew v. Horwinton*, id., 408; *Lowell v. Oliver*, 8 Allen, 247; *McCulloch v. Maryland*, 4 Wheaton, 425 to 436.

IV. Let us now examine into the character of railroad

companies so as to determine whether they are *public*, *quasi public*, or *private* corporations. For more than eighteen years, from 1852 up to 1870, when the case of *The People v. Salem*, 20 Mich., 452, was decided, the doctrine of the supreme court of Michigan was that railroad companies were public, or *quasi* public corporations. In the case of *Swan v. Williams*, 2 Mich., 427, decided in 1852, that supreme court says : " Most certain it is, that as to all their rights, powers, and responsibilities, three grand classes of corporations exist. *First*, Political or municipal corporations, such as counties, towns, cities and villages, which from their nature are subject to the unlimited control of the legislature. *Second*, Those associations which are created for public benefit, and to which the government delegates a portion of its sovereign power, to be exercised for public utility such as turnpike, bridge, canal and *railroad companies;* and *Third, Strictly private corporations,* where the private interest of the corporators is the primary object of the association, such as banking, insurance, manufacturing, and trading companies." * * * " The *object* defines the *character* of these associations by whatever name they may be styled." * * * " The object which determines the character of a corporation is that *designed by the legislature* rather than that *sought by the company.* If that object be primarily the private interests of its members, although an incidental benefit may accrue to the government therefrom, then the corporation is private; but if that object be the public interest, to be secured by the exercise of powers *delegated for that purpose,* which would otherwise repose in the State, then, although *private interests* may be incidentally promoted, the corporation is in its nature *public*—it is essentially 'the *trustee* of the government for the promotion of the

15. Railroads constructed for public, and not for private purposes.

objects desired—a mere *agent* to which authority is dele-
gated to work out the public interests through the means
provided by government for that purpose, and broadly
distinguishable from one created for the attainment of no
public end, and from which no benefit accrues to the
community except such as results incidentally and not
necessarily from its operation.   In the creation of this
class of corporations, *public duties* and *public interests* are
involved, and the discharge of those duties and the at-
tainment of those interests are the primary objects to be
worked out through the powers delegated to them.   To
secure these, the right of preeminent sovereignty is exer-
cised by the condemnation of lands to their use, a right
which can never be exercised for private purposes.   *How,
then, can they be regarded as private associations,* from the
acts of which an *incidental* benefit only springs to the pub-
lic?"   "Nor can it be said that the property, when taken,
is not used by the public, but by the corporators, for
their own profit and advantage.   It is unquestionably
true that these enterprises may be, and probably always
are, undertaken with a view to private emolument on
the part of the corporators; but it is none the less true
that the object of the government in creating them is
public utility, and that private benefit, instead of being
the occasion of the grant, is but the reward springing
from the service."   (2 Mich., 434 to 436.)

In the case of the *Miners' Ditch Co. v. Zelerbach*, 37
Cal., 543, 577, Chief Justice Sawyer says:   "There are
several classes of corporations, such as public municipal
corporations, the leading object of which is to promote
the public interest; corporations technically private, but
yet of a *quasi public character,* having in view some great
public enterprise, in which the public interests are di-
rectly involved to such an extent as to justify conferring

upon them important government powers, such as an exercise of the right of eminent domain; of this class are *railroad*, turnpike and canal companies; and corporations *strictly private*, the direct object of which is to promote private interests, and in which the public has no concern, except the indirect benefit resulting from the promotion of trade and the development of the general resources of the country."

In the case of *Osborn v. The United States Bank*, 9 Wheaton, 738, three important questions were decided: *First*, That congress had no power to create *private* corporations, the federal government being a government of delegated powers, and the power to create *private corporations* not being among the powers delegated. *Second*, That congress had power to create corporations as instrumentalities by which to carry out a delegated power, and that such corporations were to be classed as *public corporations*. *Third*, That a banking corporation created for such a purpose, although four-fifths of its capital stock was owned by private individuals, and it was engaged, in part, in *private banking* business from which *private* and individual profit was derived, (3 U. S. Stat. at Large, 266, et seq.,) was nevertheless a *public corporation*. Chief Justice Marshall, who delivered the opinion of the court, said: "The bank is not considered as a private corporation whose principal object is individual trade and individual profit, but as a *public corporation*, created for *public and national purposes*. That the mere business of banking is in its own nature a private business, and may be carried on by individuals and companies having *no political connection* with the government, is admitted; but the bank is not such an individual company. *It was not created for its own sake, or for private purposes.* It has never been supposed that congress could create such a

corporation. It is not an instrument which the government found ready-made, and was supposed to be adapted to its purposes, but one which was created in the form in which it now appears, *for national purposes only.* It is undoubtedly capable of transacting *private* as well as *public* business. While it is the great instrument by which the fiscal operations of the government are effected, *it is also trading with individuals for its own advantage.* The appellant endeavors to distinguish between this trade and its *agency for the public,* between its banking operations and those qualities which it possesses in common with every other corporation, such as individuality, immortality," etc. 9 Wheaton, 860, 861.

In this State the register of deeds accepts his office for *private* gain and emolument. His business is with and for *private* individuals. He is paid by the individuals for whom he does the work, and not by the State or the county. Is he a *public officer,* or *strictly a private* individual? This same question might be asked with equal propriety with regard to several other public officers. In this connection, we would refer to the following authorities: 18 Wend., 9, 15, 16; 3 Paige, 45, 75; 8 Dana, 296; 3 Wis., 612; 6 Wis., 636; 10 Wis., 280; 2 Dev. & Bat., (N. C.,) 468; 61 Penn. St , 27; 2 N. H., 25; 5 Nevada, 285, 307, *et seq.*, and cases there cited; 21 Penn. St., 47, 179; 13 Wis., 43.

It is undoubtedly true that railroad companies, in contradistinction to municipal corporations, are always classed as private corporations; and with this classification, we find no fault; but to class them with other private corporations, is a great mistake. They differ materially from all other private corporations in many respects, and with reference to them, ought to be classed as public. The sovereign power of eminent domain,

which is always conferred upon railroad companies, has never been and could not be conferred upon a strictly private corporation. And the government exercises a control over railroad companies in compelling them to carry passengers and freight, and in regulating the prices of the same to an extent never exercised over strictly private corporations or private persons. The power exercised by municipal corporations in regulating the fares of hackmen and draymen comes nearest to that exercised by the legislature in regulating fares and freights of railroad companies. But the former is only a police regulation in cities, while the latter is the exercise of a sovereign legislative power, founded upon the doctrine that a railroad company is a *public agency of the government*. And there are other distinctions between railroad companies and hackmen and draymen which we will hereafter mention as we proceed with this discussion. It will be admitted that a strictly private railroad corporation might be organized under the authority of the legislature, a corporation whose powers and duties would be similar in all respects to other private carriers of freight and passengers, such as the proprietors of stage-coaches, hacks, drays, etc.; and while such railroad corporation would be relieved, as other private carriers of freight and passengers are from many of the restraints and duties of a public or *quasi* public railroad corporation; while it would, of course, be free to carry any kind of freight it chose, or any class of passengers it chose, when it chose, or exclude all, and carry freight only for itself, yet it could not exercise the right of eminent domain as a public or *quasi* public railroad corporation does. It would have to purchase the land over which it should construct its road; but if the owner of the land would

not sell, it could not build its road; its progress would necessarily come to an abrupt termination.

But as we have before stated, it makes no difference whether we call a railroad company a public, *quasi* public, or a strictly private corporation. It is the ultimate end, object, and purpose, that must determine the power of the legislature to act in the premises, and not the nature or character of the corporation or person through whose intermediate agency, this end, object, or purpose, is expected to be accomplished. Nearly all the public works of this State, and of counties, cities, towns and villages, have been accomplished through the agency of private corporations, or of private individuals. The work is usually let by contract to the lowest bidder, and no one has ever yet supposed that it was illegal because it was not done by a public officer or a public corporation. The most of the public printing of this State has been done by private persons; for up to 1869 we had no public printer. The public buildings are erected, mails carried, goods transported, and many other things we might mention, are done for the public by private corporations or private persons. And it has never been contended, nor with reference to any other class of cases, that the government could accomplish a public purpose only through the agency of a public servant. It has heretofore been supposed that whatever the government did through the agency of a private corporation or private individual it did itself; *qui facit per alium, facit per se;* and what valid objection can there now be raised to the government accomplishing a public purpose through a private agency ? For the purposes then of this argument we may well admit that a railroad company is a *private* corporation; though we shall of course claim that the use of a railroad is a public use or purpose. But it is not only claimed

that a railroad company is a private corporation, but it is also claimed that the property it possesses is strictly private property. And therefore it is claimed with great confidence that the use of such property must necessarily be strictly and absolutely a private use or purpose. A glaring *non sequitur*. A fallacy that ignores one of the fundamental principles of law—a principle older than railroads, older than any living-jurist, old as law itself— the principle that the title to a thing and the possession thereof may be vested in one person for the use and benefit of another. The government seldom owns the building in which a postoffice is kept; it seldom owns any material portion of the furniture of the postoffice; and is the use of such property, for that reason purely and strictly a private use? Suppose the State should employ an individual to carry stationery from the depot in North Topeka to the state house; would the transportation of such property be any the less a public purpose because the person so employed might be a private individual, and the wagon and horses with which he should transport the stationery might be private property? And will it be contended that no taxes could be levied nor public funds used to pay for the services of a postmaster and for the use of his' house and furniture, or to pay for the services of said individual, and for the use of his horses and wagon, simply because the postoffice and furniture and the horses and wagon are private property? And will it be contended that the carrying of said stationery is purely and strictly a private purpose? It may be private with regard to the individual, but it is public with regard to the State and the public.

We have the combined authority of every legislature, of every executive, and of every court in the United States that the construction and operation of a railroad,

even in the hands of a (usually called) private corporation, is a public purpose; for if it were otherwise every lawyer in the land knows that the sovereign power of eminent domain could not be exercised in its favor. This ought to be conclusive of the question; but it is said it is not *such* a public purpose as will support taxation. Strange indeed! The power of eminent domain is limited in its scope and operation to but few subjects. At every step it is traversed and opposed. Everywhere the plea of inexorable necessity must be interposed in its favor or its progress is ended. Not so with taxation. As we have already seen, taxation is the most universal, broad, sweeping and unlimited power possessed by governments. It is the power to destroy, and has no limit except in the will of the sovereign. (Per Marshall, C. J., in *McCullough v. Maryland*, 4 Wheat., 316, 425 to 436.) No instance has been shown nor can be shown where the government may aid a thing by the power of eminent domain, where it cannot also aid it by the power of taxation. No instance has been shown nor can be shown where the government may aid a thing by the exercise of any of its sovereign powers, where it may not also aid it by taxation.

A railroad is a public purpose because it increases the facility for travel and transportation from one part of the country to another. In this respect it is a great and inestimable public benefit, which may be better described by others than by the courts. And yet there are other public benefits incidentally springing from the construction and operation of railroads. The increased value of all property within their vicinity is one; but this is probably only a measure of the value of the increased facility for travel and transportation. The increase of the public revenue is another, and this, or rather the decrease of the

public burdens cannot well be overestimated. As railroads progress, agriculture, trade and commerce, with all the arts and sciences of an enlightened civilization follow in close proximity and with a celerity that would astonish the inhabitants of fairy land. Cities, towns, and villages spring up with a marvelous growth that would rival the fabulous creations of Aladdin and his wonderful lamp; and in districts where the tax collector was never before known, immense revenues flow into the public treasury with a copiousness and a profusion that would astonish the wealthiest of the sovereigns of ancient or modern times. In Wisconsin it seems to be considered that the mere taking of stock in a railroad company, by a municipal corporation, is sufficient of itself to make the railroad a public purpose, such as will sustain taxation and render the act of the legislature authorizing it valid. (*Whiting v. Sheboygan R. R. Co.*, 25 Wis., 167, 186, 209.) Now while we do not wish to controvert this doctrine, still we do not wish to found such a broad superstructure upon such a narrow basis. If a railroad company is purely a private corporation, and if the construction and operation thereof is purely a private purpose, neither the government nor any municipal corporation has any right to become a stockholder therein. Governments were not organized for the purpose of engaging in private enterprises or private business, but only for the transaction and promotion of public affairs. Even if the purchase of stock in a railroad company should be a paying transaction as an investment, (which, unfortunately for counties and municipal corporations, it is not,) still a governmental organization would have no right, for that reason alone, to engage in it, for governmental organizations are not created for purposes of speculation, nor are they created for the purpose of enriching the organization as

such, but only for the purpose of promoting the general welfare of the individual members thereof as citizens. The increased facility for travel and transportation is the main object in the creation of railroads, and this it is which constitutes a railroad a public purpose. All other benefits, though belonging of right to the public, are simply incidental. When this facility is made absolutely free by the government, (all persons having the right to use it,) all will admit that it is then a public purpose, and such a public purpose as will support both the right of eminent domain and taxation. When it is absolutely free, except that the government demands and receives a compensation for its use, all will admit that it is still a public purpose, and such an one as will support both the right of eminent domain and taxation. When it is absolutely free, except that a railroad corporation receives the compensation instead of the government, though fixed by the government, all will admit that it is still a public purpose, and one that will support the right of eminent domain; but it is denied by the plaintiffs in error that it will still support the right of taxation. Why this distinction is made in favor of the right of eminent domain and against the right of taxation has never yet been shown and cannot be shown. If any distinction is to be made, it should be (as we think we have heretofore shown) the other way—against the right of eminent domain and in favor of taxation. How is it that a railroad is so eminently a public purpose that the homestead, with all its endearments, may be taken from the owner, and himself and family, his wife and little children, driven out of doors, houseless and homeless, in order that the homestead may be converted into a roadway or depot, while at the same time the railroad partakes so little of a public character that one cent could not be

34

levied as a tax to aid in its construction or operation? How is it that to take the homestead is constitutional and valid, and to be encouraged, while to take the one cent tax is unconstitutional, invalid, and an unwarrantable infringement upon private rights? Both are taken for the same purpose, to be applied to the same use, and to belong to and be controlled by the same corporation.

It is admitted that a railroad is a great public purpose, in one sense, because it adds vastly to the facilities for travel and transportation; but it is claimed that it is also a great private purpose, in another sense, because it adds vastly to the private wealth of a private corporation. All admit that the government may deal with the railroad in its public sense, until the government has exercised the right of eminent domain in favor of the railroad, but then it is claimed that the government must forever afterwards, and in all other cases, close its eyes upon the railroad as a public purpose, and see the railroad only in its private character. Is this logical? As a railroad is a public purpose in one sense, and a private purpose in another, who shall dictate to. the government in which sense it shall regard the railroad, 'or in which sense it may deal with it? In the case of *Talbot v. Hudson,* 16 Gray, 423, 424, 425, the supreme court of Massachusetts use the following language: "The act is therefore in a· certain sense for a private use, and inures directly to the individual advantage of such owners; but this is by no means a decisive test of its validity. Many enterprises of the highest public utility are productive of great and immediate benefits to individuals. * * * We are therefore to look further into the probable operation and effect of the statute in question, in order to ascertain whether some public interest or benefit may not be likely to accrue from the execution of the power conferred by

it upon the defendants. If any such can be found then we are bound to suppose that the act was passed in order to effect it. We are not to judge of the wisdom or expediency of exercising the power to accomplish the object. The legislature are the sole and exclusive judges whether the exigency exists which calls on them to exercise their authority. * * * In a broad and comprehensive view, such as has been heretofore taken of the construction of this clause of the declaration of rights, everything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the State, or which leads to the growth of towns and the creation of new sources for the employment of private capital and labor, indirectly contributes to the general welfare and to the prosperity of the whole community. It is on this principle that many of the statutes of this commonwealth by which private property has been heretofore taken and appraised to a supposed public use are founded. Such legislation has the sanction of precedents coevil with the origin and adoption of the constitution, and the principle has been so often recognized and approved as legitimate and constitutional that it has become incorporated into our jurisprudence."

Many parallels have been drawn between railroads and various other kinds of business, for the purpose of showing that a railroad is a private purpose and therefore not entitled to receive public aid. Now, analogical reasoning does not always lead with unerring certainty to the right conclusion, and in this case it wholly fails. It has been suggested that the right of eminent domain may be exercised in favor of mills, (or rather mill dams,) bridges, ferries, etc., as well as in favor of railroads, and that the right of taxation cannot be exercised in favor of the

former, and therefore it is inferred that taxation cannot be exercised in favor of railroads.   Another glaring *non sequitur*.   If it were true that mills, bridges, ferries, etc., could be aided by the exercise of the right of eminent domain, and not by taxation, it would not at all follow as a logical sequence that everything else which could be aided by the exercise of the right of eminent domain could not be aided by taxation.   But even if such would follow, still the premises upon which this supposed argument is founded are false, and therefore the conclusion may also be false.   If these were merely private mills, private bridges, and private ferries, neither the right of eminent domain nor the right of taxation could be exercised in their favor; but if they are public, or *quasi* public, as a railroad is public, then there can be no sufficient reason given why both the right of eminent domain and the right of taxation may not be exercised in their favor.

The supposed parallel between railroads and hotels, stage coaches, hacks, drays, etc., fails in more particulars than the parrallel attempted to be drawn between railroads and mills, bridges, ferries, etc.   The opening of hotels, the running of stage coaches, hacks, drays, etc., has never been considered as incumbent upon governments.   Governments have never undertaken to keep hotel, run stage coaches, etc., and it has never been considered that there was any moral or legal obligation resting upon them to do so.   But the duty of opening highways, canals, and other like improvements for the accommodation of travel and commerce, has always been considered most binding upon all governments.   In favor of railroads, and public mills, bridges, and ferries, the right of eminent domain has always been excercised, but in favor of hotels, stage coaches, hacks, and drays, never. But if hotels, stage coaches, hacks, or drays, should ever

become of such public importance as to authorize the exercise of the right of eminent domain in their favor, there can be no question but that the right of taxation might then also be exercised in their favor. It is also supposed that a parallel exists between railroads and physicians, printing establishments, and various other kinds of private business. Now the similarity between a railroad and a physician, or a railroad and a printing press, is not very striking or obvious, and what there is of resemblance is in the wrong place for the benefit of the inference sought to be drawn therefrom.

It will be noticed that all of the examples given to prove that a railroad cannot be aided by taxation are of a purely private character, and not one of them of a public or *quasi* public character, such as a railroad undoubtedly is. Now, in order to make the argument drawn from these examples of any value whatever, it must be shown that if these occupations referred to were made public, like a railroad, and subject to all the restraints of a railroad, still they could not be aided by taxation. This has not been shown, nor attempted to be shown. In fact it has not been shown nor attempted to be shown that all or any of these occupations mentioned are not already of sufficient public character to be aided by taxation if the legislature should desire to do so. And again: If a perfect equality exists between railroads and all the different kinds of business and occupations, such as stage coaches, hacks, drays, printing presses, physicians, etc., so that taxation cannot be exercised in favor of the one, unless it can also be exercised in favor of the other, then it must necessarily follow that the right of eminent domain cannot be exercised in favor of the one, unless it can also be exercised in favor of the other; for instance, that the right of eminent domain may be exercised in

favor of stage coaches, hacks, drays, printing presses, physicians, etc., which is contrary to all opinion, or that it cannot be exercised in favor of railroads, which is equally opposed to all opinion. And suppose there is in fact, as is claimed, no distinction between railroads and stage coaches, hacks, drays, etc., and that it is inconsistent and illogical for the law to make a distinction, will that absolutely prove that railroads cannot be aided by taxation? If consistency is all that is needed, why not say that stage coaches, hacks, drays, etc., *may be aided by taxation*, and then the consistency would be perfect? But every lawyer knows that the law is not always consistent or logical. The men who make the laws are not always profound statesmen or logicians. Chief Justice Cooley, in the recent Michigan case, (*People v. Salem*, 20 Mich., 485,) attempts to lay down a rule whereby we may know what may be aided by taxation and what may not. His language is as follows: " The term ' public purpose,' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification to distinguish objects for which, according to *settled usage*, the government is to provide, from those which, by a like settled usage, are left to private inclination, interest, or liberality." (See also Cooley Const. Lim., 533.) If this rule is correct, the whole question depends upon what is the *settled usage*, and not upon any rules of consistency or logic. Now admitting, for the sake of the argument, that all the supposed parallels attempted to be drawn between railroads and other kinds of business are critically exact, and still it seems to us clear beyond all doubt that railroads must fall within the rule prescribed by Judge Cooley, although the other

kinds of business may not. Has it not been the settled usage in this country, for the last thirty years, to aid railroads by taxation? Are they not classed with the objects—the public purposes—for which the government will provide? There can be no doubt upon this question. It has been settled by an almost universal usage, and by a long list of judicial decisions, back to a time when this State was a wilderness, a part of the " Great American Desert," that railroads may be aided by counties and municipal corporations; and if the law as thus settled is inconsistent or illogical it must so remain until amended by proper authority. If the law or the constitution has been so inconsistent and illogical as to take up one class of objects and aid foster them, and leave another class precisely like them unprovided for, the courts cannot so amend the law as to make it consistent and logical. That does not fall within the scope of judicial authority. But if the courts do attempt to so amend the law, will they *repeal* the law authorizing aid to railroads, or will they *amend* the law so as to give aid to stage coaches, hacks, drays, etc.? Either would make the law consistent. We do not admit, however, that there is any inconsistency in the law in this respect. On the contrary, we claim that there is a broad distinction between railroads and any other business of a purely private character.

We can suggest however, a more exact parallel, a closer analogy, than any that has yet been suggested, and still it will not be claimed by the plaintiffs in error that it proves anything in their favor. Of all the different kinds of strictly private business that exist or may be imagined, that of a strictly private railroad corporation, such as we have heretofore supposed might be organized under the authority of the legislature, would come nearest in similitude to that of a *quasi* public railroad corporation,

such as are actually organized; and yet the dissimilarity between the two corporations would be just great enough to destroy the desired inference sought to be drawn from their resemblance. We will admit that the strictly private corporation would not be entitled to receive public aid, but that does not at all prove that the *quasi* public corporation would be in the same condition.

There has been a half expressed, half suppressed, claim that the right of eminent domain is not exercised in favor of railroad corporations because of their public character, but that it is exercised under the maxim, *Sic utere tuo, ut alienum non lædas*. This is comic as well as novel. Because a man must so *use and enjoy* his own property as not to injure the rights of others, it is claimed that he must be totally deprived of its use, and must allow a *strictly private corporation* (as is claimed) to take possession of it, and use and enjoy it.

It is also claimed that the taxes must be duly apportioned, and the district taxed must have a special interest in, and be specially benefited by the thing for which the taxes are levied. This is admitted; but still the government has a very broad and extensive discretion in the matter. The most that the legislature can do is to adopt the best rules within their power for the apportionment of the taxes. And these rules, however good will sometimes be found to work injustice and hardship. No system has ever yet been devised, and the wisdom of man will probably never be able to devise, a system of apportionment that will do exact justice to every individual and to every locality. In cases of local improvements, or improvements that confer local benefits, the best system for securing the rights of the locality to be taxed that has yet been tried, is to let the locality itself say how much

16. Rule for determining extent of municipal aid.

the benefit is worth, and therefore how much it is willing to be taxed for it. Under such a rule the locality taxed can certainly have no right to complain. This rule has been adopted in the present case, and the county of Leavenworth has declared how much she thinks the benefit is worth to her, and the amount for which she is willing to be taxed.

In cities where street improvements are made, a street anywhere in the city is considered of such a public benefit to the whole city that the whole city may be taxed for any improvements made thereon. And it is also considered of such a special and local benefit to each individual owning property adjacent thereto, that he may be taxed for the entire cost of the improvements made in front of his own property. (*Hoyt v. Saginaw*, 19 Mich., 39; *Hines v. Leavenworth*, 3 Kas., 186; *City of Leavenworth v. Mills*, 6 Kas., 288.)

A railroad built anywhere in the State is a public benefit to the whole State, and upon the same principle as taxation for street improvements, in the absence of any constitutional restrictions, the whole State could be taxed for its construction; and as each locality is also specially benefited by the improvement, there seems to be no good reason why it, instead of the State, should not be taxed to the extent of that benefit. Such has been the practice in nearly all the States of this Union. (See the numerous decisions heretofore cited.) On the continent of Europe, where railroads are generally constructed and owned by the government, we understand that both systems of taxation are considered legal. The whole State may be taxed to build the road, or the localities through which it is located may be taxed to build it. The question in this case is presented in its simplest form. It is not proposed to overrule, but to enforce the will of those

to be affected.    The road passes through the county proposed to be taxed, though it also passes beyond the limits of the county and through many other counties.    The aid is not a donation, but it is a subscription to the stock of the road, giving to the county an interest in, and a share of, the control of the corporation.    The tax is not imposed by others upon the county, nor by the county upon others than its members, nor by the county on a portion only of its community; but it is imposed by the county on itself.    In the case of *The City of Aurora v. West*, 9 Ind., 74, 82, the supreme court of Indiana, speaking upon the point now under discussion, and the power of a city to aid a railroad extending beyond its limits, used the following language : " It is true the water works may benefit nobody but the citizens of the city, while the railroad may benefit the surrounding country to some extent; at the same time it confers a great local benefit on the city, one, perhaps, greater than the water works. But where such is the case, should the city be deprived of the right to benefit iiself locally, because it cannot do so without also benefiting others ?   And if the argument is a good one that cities are necessarily incapable of aiding any improvement that may extend beyond the corporate limits, will it not apply with equal force to States ? May it not be said that a State is created to govern within its territorial limits; and hence that it is unconstitutional for it to aid any work extending beyond those limits ? That Indiana, therefore, could not aid in the construction of the Wabash and Erie canal, because it extended into Ohio ; that she could not, with the consent of Ohio, construct that portion of the Whitewater canal lying in that State, because it was without her territorial limits ; that South Carolina could not aid in the construction of a railroad to Memphis, in Tennessee, or to New Orleans,

in Louisiana.   But is this the doctrine?   A *State* can do
what its constitution does not, by positive provision or
reasonable implication, prohibit.   The United States and
city corporations can do only what their constitutions·
permit.   If the constitution of the United States expressly
authorized the government to construct, with the consent·
of the States, roads within their limits, would there be·
any doubt of their power to do so?   If a State, then, can
construct by permission—if South Carolina can, with the·
consent of Tennessee, construct a road in that State—can-
not a city of a State·be authorized by the State to take·
stock in a road extending beyond her corporate limits?"

We have conceded that taxes can only be levied for a·
public purpose.   But who is to determine what is a pub-
lic purpose, or when the public exigencies require that a
tax shall be levied, we have not discussed, and do not
propose to discuss in this case.   That it rests largely in
the discretion of the legislature, and that the courts have
but little to do with the question, we think must be clear
beyond all doubt.   Judge Cooley says that " Taxes should
only be levied for those purposes which properly consti-
tute a public burden.   But what is for the public good,·
and what are public purposes, and what does constitute·
a public burden, are questions which the legislature must
decide upon its own judgment, and in respect to which·
it is vested with a large discretion, which cannot be con-
trolled by the courts, except, perhaps, where its action is·
clearly evasive, or where, under pretense of a lawful au--
thority, it has assumed to exercise one that is unlawful."·
(Cooley Const. Lim., pp. 129, 488.)*   As to what is such
a public benefit that it may be aided by the public, seems·
to be a question of public policy—of political economy,
which must almost exclusively be determined by the

[ * SEE *Harding v. Funk and Deihl*, to be reported in 8 Kas., and authorities therein·
cited.—REPORTER.]

legislature. And when the legislature have determined the question—when they have determined that a certain thing is of such great public benefit that it is public policy to aid it by taxation, if the courts may still say that such is not public policy, and for that reason declare the act of the legislature unconstitutional, the courts must possess almost despotic power. If such is correct doctrine, then there is an appeal from the legislature to the courts on mere questions of policy.

The ancient and venerable rule of *stare decisis* also requires that we should declare in favor of the power of the legislature to grant municipal aid to railroad companies. Twice this court has already so decided, and each time by an unanimous court. These decisions have been published by legal authority, and have become rules of property, and precedents for future decisions. In the first case, which was decided in 1864, the present Chief Justice delivered the opinion of the court: *Burnes v. Atchison*, 2 Kas., 454. In the second, which was decided in 1865, Chief Justice Crozier delivered the opinion of the court: *Atchison v. Butcher*, 3 Kas., 104. Several other cases have been decided in this court, in which it seems to have been assumed without question that such acts were valid.

We might also state here, that not only the great weight of authority in the United States is in favor of the validity of such acts as the one we are now considering, but also the more recent decisions are likewise in favor of the validity of such acts. The Michigan case, already referred to, is the last decision against such validity, while the following cases, decided since the Michigan case, are in favor of their validity: *Stewart v. Supervisors of Polk Co.*, 30 Iowa, 9; *Langhorn v. Robinson*, 20 Grattan, 661; *Danville v. R. R. Co.*, 43 Vermont,

144; *The Lafayette, Muncie & Bloomington R. R. Co., v. Geiger*, 34 Ind., 185; *King v. Wilson*, 3 Chicago Legal News, 137; 1 Dillon's Cir. Ct. Rep., 555; *Stockton & Vasalia R. R. Co. v. The Common Council of Stockton*, decided by the supreme court of California, May 12, 1871.

V. There are three other questions attempted to be raised in this case: *First*, It is claimed that a vote of the people of Leavenworth county on the question, (in substance,) whether the commissioners of said county should issue $250,000 of the bonds of said county, to be expended in the stock of the Union Pacific Railway Company, Eastern Division, which was carried in the affirmative, was not sufficient to authorize the said commissioners to make said subscription and to issue said bonds, as they did, in payment therefor. We think it was. *Second*, It is claimed " that such bonds shall be issued only in payment of assessments made upon all the stock of such railroad company." This is admitted. And while it does not appear that any formal order was made upon the records of said railway company making any assessments, yet all the stock that was issued by the company, to any person or county, was full-paid stock. This answered substantially the requirements of the law. *Third*, It is claimed that the commissioners on the part of the county had done all they could do to pay this bond; and therefore that the county was not liable. The reverse of this is true, and therefor this question is not in the case.

The judgment of the court below is affirmed.

KINGMAN, C. J., concurring.

BREWER, J., not sitting in the case; (but see his *dissenting* opinion in the case next following, to-wit, *The State, ex rel. The St. Jos. & Denver City R. R. Co. v. The Commissioners of Nemaha County*.)